IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | Jointly Administered Under |
| S CHASE LIMITED PARTNERSHIP., *et al.,* | § | |
| | § | Case No. (18-31017-H1-11) |
| Debtors. | § | |

### JOINT DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 AND BANKRUPTCY RULE 3016 IN SUPPORT OF JOINT PLAN OF LIQUIDATION OF S. CHASE LIMITED PARTNERSHIP, W. POINT LIMITED PARTNERSHIP AND CROSSWINDS HOUSTON LIMITED PARTNERSHIP

**IMPORTANT: THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. IT IS NOT BEING PROVIDED TO YOU WITH THE INTENT TO SOLICIT YOUR VOTE TO ACCEPT ANY PLAN OF REORGANIZATION. THE DISCLOSURE STATEMENT IS MERELY BEING PROVIDED TO YOU AS A PART OF THE DISCLOSURE STATEMENT APPROVAL PROCESS PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 3016 & 3017.**

**THE BANKRUPTCY COURT WILL CONDUCT A HEARING TO CONDITIONALLY APPROVE THE ADEQUACY OF THIS DISCLOSURE STATEMENT ON JUNE 26, 2018, AT 4:00 P.M., IN COURTROOM 404 AT THE COURTHOUSE LOCATED AT 515 RUSK AVENUE, HOUSTON, TEXAS 77002, BEFORE THE HONORABLE UNITED STATES BANKRUPTCY JUDGE MARVIN ISGUR.**

**[PAGE TO BE REMOVED AFTER DISCLOSURE STATEMENT APPROVED.]**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| | § | **Jointly Administered Under** |
| **S CHASE LIMITED PARTNERSHIP., *et al.,*** | § | |
| | § | **Case No. (18-31017-H1-11)** |
| **Debtors.[1]** | § | |

**JOINT DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 AND
BANKRUPTCY RULE 3016 IN SUPPORT OF JOINT PLAN OF LIQUIDATION OF
S. CHASE LIMITED PARTNERSHIP, W. POINT LIMITED PARTNERSHIP
AND CROSSWINDS HOUSTON LIMITED PARTNERSHIP**

THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF THE DEBTORS ENTITLED TO VOTE ON THE PLAN HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE DEBTORS' PLAN. ALL CREDITORS ARE URGED TO READ THE DISCLOSURE STATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY.

ON JUNE 26, 2018, THE BANKRUPTCY COURT CONDITIONALLY APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE. SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN HEREIN DESCRIBED AND ATTACHED AS EXHIBIT A, IS BEING SOUGHT FROM CREDITORS WHOSE CLAIMS AGAINST THE DEBTORS ARE IMPAIRED UNDER THE PLAN OF LIQUIDATION. CREDITORS ENTITLED TO VOTE ON THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN AND TO RETURN THE BALLOT INCLUDED WITH THIS DISCLOSURE STATEMENT UPON COMPLETION IN THE ENVELOPE ADDRESSED TO HOOVER SLOVACEK LLP., ATTENTION: MELISSA A. HASEDEN/DEIRDRE CAREY BROWN, 5051 WESTHEIMER, SUITE 1200, GALLERIA TOWER II, HOUSTON, TEXAS 77056, NOT LATER THAN JULY 25, 2018, AT 2:00 P.M., HOUSTON TIME.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: S Chase Limited Partnership (2513), Case No 18-31017; Crosswinds Houston Limited Partnership (2014), Case No. 18-31018; a n d W Point Limited Partnership (2546), Case No. 18-31020. The location of the Debtors' service address is: 1032 Royal Marquis Circle, Ocoee, FL 34761.

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... I

DISCLOSURE STATEMENT .......................................................................................... 1

I.   INTRODUCTORY STATEMENT .......................................................................... 1

II.  VOTING PROCEDURES .......................................................................................... 3

III. IMPAIRMENT OF CLAIMS ................................................................................... 5

IV.  NATURE AND HISTORY OF BUSINESS ............................................................. 6

   A.   SOURCE OF INFORMATION AND ACCOUNTING METHOD ........................ 6
   B.   GENERAL INFORMATION ABOUT THE DEBTORS ...................................... 6
      1.   The Debtors ............................................................................................ 6
         a.   Assets/Business Model ............................................................ 6
         b.   Liabilities ................................................................................. 8
         c.   Administrative Claims Analysis ............................................ 9
      2.   Financial Difficulties and Restructuring .......................................... 10
         a.   Disputed Secured Lenders Claims ....................................... 10
         b.   Loans from Affiliates ............................................................ 11
         c.   Events Leading to Bankruptcy ............................................ 13
         d.   Claims against Secured Lenders ......................................... 15
      3.   Financial Situation as of Petition Date ............................................. 16
      4.   Ownership and Management .............................................................. 16
      5.   Significant Actions in Bankruptcy Case ........................................... 17
         a.   Voluntary Petition Filing ..................................................... 17
         b.   Administration – "First Day" Motions ............................... 18
         c.   Retention of Professionals. ................................................... 18
         d.   Appointment of Examiner and Examiners Report ............ 18
         e.   Resolution of Health Safety Welfare Concerns ................. 18
         f.   The Marketing and Sales Process ....................................... 19
         g.   Orion Contract Rejection ..................................................... 20
         h.   Proposed DIP Financing and Roof Repairs ....................... 20
         i.   Adversary Proceeding Against BCDR and Presto ............ 21
         j.   Claims Bar Date. ................................................................... 21
         k.   Future Operations and Management ................................... 21
   C.   CASE MANAGEMENT GOING FORWARD ..................................................... 22
      1. Plan Negotiations ................................................................................. 22
      2. Assumption and Rejection .................................................................. 22

V.   DESCRIPTION OF PLAN ..................................................................................... 22

   A.   OVERALL STRUCTURE OF THE PLAN ....................................................... 23
   B.   ADMINISTRATIVE EXPENSES AND TIMING OF PAYMENT ................... 23
      1.   Administrative Claims Bar Date ........................................................ 23
      2.   Payment of Administrative Claims .................................................... 24
   C.   CLASSES OF SECURED, PRIORITY, AND UNSECURED CLAIMS AND TREATMENT OF
   INTERESTS.......................................................................................................... 24

    D.   Means of Execution of Plan ........................................................................... 27
    E.   Other Provisions of the Plan ........................................................................ 28

**VI.   LIQUIDATION ANALYSIS**.......................................................................**33**

**VII.  RISKS POSED TO CREDITORS**................................................................**34**

**VIII. ALTERNATIVES** .......................................................................................**35**

    A.   Conversion to Chapter 7 ............................................................................. 35
    B.   Dismissal ..................................................................................................... 35
    C.   No Assurance of Either ................................................................................ 35

**IX.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES**............................**35**

    A.   Tax Consequences to Creditors ................................................................... 35
        1.  Generally ............................................................................................. 35
        2.  Unsecured Claims ............................................................................... 36
    B.   Tax Consequences to the Debtors ............................................................... 36

**XI.   LITIGATION - PENDING AND POTENTIAL LITIGATION** .....................**37**

    A.   Prepetition Litigation .................................................................................. 37
    B.   Reserved Litigation Claims ......................................................................... 37

**XII.  MANAGEMENT OF THE DEBTORS** ........................................................**39**

    A.   Officers of the Debtor ................................................................................. 39

**XIII. ACCEPTANCE AND CONFIRMATION OF THE PLAN**............................**39**

    A.   Acceptance of the Plan ................................................................................ 39
    B.   Confirmation without Acceptance of All Impaired Classes ................................ 40
    C.   Other Requirements for Confirmation .......................................................... 40
        1.  Best Interest of Creditors ................................................................... 40
        2.  Financial Feasibility ........................................................................... 41
    D.   Cram-Down - Confirmation Without Acceptance by All Impaired Classes ....... 41

**XIV. CONCLUSION** ........................................................................................**42**

**DISCLOSURE STATEMENT**

S. Chase Limited Partnership ("SCLP"), Crosswinds Houston Limited Partnership ("CHLP"), and W. Point Limited Partnership ("WPLP), debtors and debtors in possession (collectively the "Debtors"), debtors and debtors-in-possession herein, submit this Joint Disclosure Statement ("Disclosure Statement") under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 in Support of their Joint Chapter 11 Plan of Liquidation to all of its known Creditors.

## I.     INTRODUCTORY STATEMENT

Debtors submit this Disclosure Statement under 11 U.S.C. § 1125 in support of their Joint Chapter 11 Plan of Liquidation under Chapter 11 of the United States Bankruptcy in connection with its solicitation of acceptances of the Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code filed by the Debtors (the "Plan").  A copy of the Plan is attached as Exhibit "A" for your review.  All terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

The relevant bankruptcy case filing information is as follows:

| Debtor Name | Petition Date | Case No. | State and year Formed | General Partner |
|---|---|---|---|---|
| S. Chase Limited Partnership | March 5, 2018 | 18-31017 | FL–2007/ authorized to act in TX- 2007 | S. Chase General Partner, Inc., FL corp. authorized to transact business in TX |
| Crosswinds Houston Limited Partnership | March 5, 2018 | 18-31018 | FL–2007/ authorized to act in TX- 2007 | Crosswinds General Partner, Inc., FL corp. authorized to transact business in TX |
| W. Point Limited Partnership | March 5, 2018 | 18-31020 | FL–2007/ authorized to act in TX- 2007 | W. Point General Partner, Inc., FL corp. authorized to transact business in TX |

The Debtors each filed a petition under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division, on March 5, 2018 and retained Hoover Slovacek LLP as bankruptcy counsel.  The Debtors have prepared this Disclosure Statement to disclose that information which, in its opinion, is material, important, and necessary to an evaluation of the Plan.  Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement must be presented to and approved by the Bankruptcy Court.  Such approval is required by statute and does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

The material herein contained is intended solely for the use of known creditors and interest holders of the Debtors and may not be relied upon for any purpose other than a determination by them of how to vote on the Plan.  As to Contested Matters, Adversary Proceedings and other actions or threatened actions, the Disclosure Statement and exhibits shall

1

not constitute or be construed as an admission of any fact or liability, stipulation or waiver, but rather as a statement made in settlement negotiations under Rule 408 of the Federal Rules of Evidence.  This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding nor shall it be construed as to be advice on the tax, securities or other legal effects of the plan as to the holders of claims against or equity interests in the Debtors or its affiliates.

To ensure compliance with Treasury department circular 230, each holder of a claim or interest is hereby notified that: (a) any discussion of U.S. Federal Tax issues in this disclosure statement is not intended or written to be relied upon, and cannot be relied upon, by any holder for the purpose of avoiding penalties that may be imposed upon a holder under the Tax Code; (b) such discussion is included hereby by the Debtors in connection with the promotion or marketing (within the meaning of Circular 230) by the Debtors of the transactions or matters addressed herein; and (c) each holder should seek advice based upon its particular circumstances from an independent tax advisor.

Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments.  While the Debtors have made every effort to retain the meaning of such other instruments or the portions transposed, it urges that any reliance on the contents of such other instruments should depend on a thorough review of the instruments themselves.

No representations concerning the Debtors or the Plan are authorized other than those that are set forth in this Disclosure Statement.  Any representations or inducements made by any person to secure your vote which are other than those contained herein should not be relied upon, and such representations or inducements should be reported to counsel for the Debtors who shall deliver such information to the Bankruptcy Court.  Finally, all terms not otherwise defined in this Disclosure Statement shall have the meanings assigned to them under the Plan.

Creditors should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made, except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.  No other party has been authorized to utilize any information concerning the Debtors or their affairs, other than the information contained in this Disclosure Statement, to solicit votes on the Plan.  Creditors and holders of equity interest should not rely on any information relating to the Debtors, other than that contained in this Disclosure Statement and the exhibits attached hereto.

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE ATTACHMENTS, NO REPRESENTATIONS CONCERNING THE DEBTORS, THE ASSETS, THE PAST OPERATIONS OF THE DEBTORS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.   ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS.**

**EXCEPT AS SPECIFICALLY NOTED, THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE**

STATEMENT.  THE DEBTORS ARE NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.  THE FACTUAL INFORMATION REGARDING THE DEBTORS, INCLUDING THE ASSETS AND LIABILITIES OF THE DEBTORS, HAS BEEN DERIVED FROM NUMEROUS SOURCES, INCLUDING, BUT NOT LIMITED TO, EACH DEBTORS' BOOKS AND RECORDS, SCHEDULES AND DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN.

THE DEBTORS ALSO COMPILED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT FROM RECORDS AVAILABLE TO IT, INCLUDING, BUT NOT LIMITED TO, PLEADINGS AND REPORTS ON FILE WITH THE BANKRUPTCY COURT, LOAN AGREEMENTS AND BUSINESS RECORDS.

THE APPROVAL BY THE BANKRUPTCY COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

NEITHER THE DEBTORS NOR COUNSEL FOR THE DEBTORS CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES.  NEITHER THE DEBTORS NOR ITS COUNSEL HAS VERIFIED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.

IF THE REQUISITE VOTE IS ACHIEVED FOR EACH CLASS OF IMPAIRED CLAIMS, THE PLAN IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN), WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

## II.    VOTING PROCEDURES

Any creditor of the Debtors whose claim is IMPAIRED under the Plan is entitled to vote, if either (1) the claim has been scheduled by the Debtors and such claim is not scheduled as disputed, contingent or unliquidated, or (2) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings, *provided, however,* any claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon motion by the creditor.  Such motion must be heard and determined by the Bankruptcy Court prior to the date established by

the Bankruptcy Court to confirm the Plan. In addition, a creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Holders of impaired claims who are entitled to vote and fail to do so will not be counted as either accepting or rejecting the Plan. Nevertheless, if the requisite vote is achieved for your class of impaired claims, you will be bound by the terms of the Plan.

A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement and mailed to creditors entitled to vote. A creditor must (1) carefully review the ballot and the instructions thereon, (2) execute the ballot, and (3) return it to the address indicated thereon by the deadline to enable the ballot to be considered for voting proposes.

**THE DEADLINE FOR RETURNING YOUR BALLOT**
**IS 11:59 P.M. CENTRAL TIME ON JULY 20, 2018**
**(THE "VOTING DEADLINE").**

After completion of the ballot, creditors should return the executed ballot in the self-addressed envelope to:

**CROSSWINDS HOUSTON LIMITED PARTNERSHIP**
**S. CHASE LIMITED PARTNERSHIP, OR**
**W. POINT LIMITED PARTNERSHIP**
**c/o MELISSA A. HASELDEN/ DEIRDRE CAREY BROWN**
**HOOVER SLOVACEK LLP**
**5051 WESTHEIMER, SUITE 1200**
**GALLERIA TOWER II**
**HOUSTON, TEXAS 77056**

**VOTING INFORMATION AND INSTRUCTION FOR COMPLETING THE BALLOT:**

**FOR YOUR VOTE TO BE COUNTED YOU MUST COMPLETE THE BALLOT, INDICATE ACCEPTANCE OR REJECTION OF THE PLAN IN THE BOXES INDICATED ON THE BALLOT AND SIGN AND RETURN THE BALLOT TO THE ADDRESS SET FORTH ON THE PRE-ADDRESSED ENVELOPE. IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

**IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS UNDER THE PLAN, YOU MAY RECEIVE MORE THAN ONE BALLOT. EACH BALLOT YOU RECEIVE VOTES ONLY YOUR CLAIMS FOR THAT CLASS. PLEASE COMPLETE AND RETURN EACH BALLOT YOU RECEIVE. YOU MUST VOTE ALL OF YOUR CLAIMS WITHIN A SINGE CLASS UNDER THE PLAN TO EITHER ACCEPT OR REJECT THE PLAN. ACCORDINGLY, A BALLOT (OR MULTIPLE BALLOTS WITH RESPECT TO MULTIPLE CLAIMS WITHIN A SINGLE CLASS) THAT PARTIALLY REJECTS AND PARTIALLY ACCEPTS THE PLAN WILL NOT BE COUNTED.**

4

**THE BALLOT IS FOR VOTING PURPOSES ONLY AND DOES NOT CONSTITUTE AND SHALL NOT BE DEEMED A PROOF OF CLAIM OR INTEREST OR AN ASSERTION OF A CLAIM.**

## III.   <u>IMPAIRMENT OF CLAIMS</u>

A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interest of that class are modified under a plan.  Modification for purposes of determining impairment however, does not include curing defaults and reinstating maturity or cash payment in full.  Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan and are thus not entitled to vote.  Classes of claims or interests receiving no distribution under a plan are conclusively presumed to have rejected the plan and thus are not entitled to vote.  Acceptances of the Plan are being solicited only from those persons who hold claims in an impaired class entitled to receive a distribution under the Plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is impaired under a plan, **<u>unless</u>**, with respect to each claim or interest of such class, the plan:

1.      Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or

2.      Notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of its claim or interest after the occurrence of a default:

     (a) Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankrupt Code;

     (b) Reinstates the maturity of such claim or interest as it existed before the default;

     (c) Compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

     (d) Does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or interest; or

3.      Provides that, on the Effective Date the holder of such claim or interest receives, on account of such claim or interest, cash, equal to:

     (a) With respect to a claim, the allowed amount of such claim; or

     (b) With respect to an interest, if applicable, the greater of:

        (i)  Any applicable fixed liquidation preference; or

        (ii)  Any fixed preference at which the Debtor, under the terms of the security, may redeem the security.

     4.     In Article 4 of the Plan, the Debtors have identified the impaired classes of creditors under the Plan.  In the event there are questions regarding whether a person is in an impaired class, the person should assume that his or her claim is impaired and vote.  If the claim is determined to be impaired, the vote will be considered by the Bankruptcy Court.  The Class 2, 3, 4 and 5 holders of claims and the Class 6 interest holders of the Debtors are impaired under the Plan.

**IMPAIRED CREDITORS ANTICIPATED TO RECEIVE A DISTRIBUTION UNDER THE PLAN ARE BEING SOLICITED TO VOTE.  IF YOU HOLD AN ADMINISTRATIVE CLAIM OR UNIMPAIRED CLAIM, THE DEBTORS ARE NOT SEEKING YOUR VOTE.**

### IV.    NATURE AND HISTORY OF BUSINESS

#### A.    Source of Information and Accounting Method

The Debtors' books are currently maintained under the supervision of Matt Summers with Kaplan Management, Inc.  Accounting is on the accrual basis.  Duncan MacPherson, Chartered Accountant in North York, Canada, ON, prepares the Debtors' annual tax returns.  Kaplan Management, Inc. is the current property manager of each Debtor.  Gordon Steele, the Chief Financial Partner of the general partner of each Debtor, supervises the operations of the Debtors.  The historical financial information contained in this disclosure statement as well as the bankruptcy schedules and statement of affairs was derived from the Debtors' books and records.  **THE DEBTORS' BOOKS HAVE NOT BEEN AUDITED BY AN INDEPENDENT PUBLIC ACCOUNTANT (OTHER THAN AS EXPRESSLY DESCRIBED HEREIN).  NO ABSOLUTE REPRESENTATION IS MADE AS TO THE ACCURACY OF THE DEBTORS' RECORDS.  HOWEVER, THE DEBTORS HAVE ATTEMPTED TO ACCURATELY REFLECT ITS BUSINESS OPERATIONS.**

#### B.    General Information about the Debtors

    1.    THE DEBTORS

       *a.    Assets/Business Model*

SCLP, CHLP and WPLP are each Florida limited partnerships authorized to conduct business in Texas.  The Debtors were each organized in 2007 under the laws of the State of Florida and registered to conduct business in Texas on or about December 3, 2007.  The Debtors were each formed to acquire, own, maintain, lease and otherwise deal with a multifamily apartment community in the Houston Metropolitan Area.  Each Debtor is managed by its general partner.  Initially, Jaymor Management Group, LLC ("Jaymor"), an entity with some common ownership with the Debtors, acted as property manager for each of the

Debtors.  In May 2015, Orion Property Group ("Orion"), an unrelated entity, replaced Jaymor as the property manager for the Debtors.  Orion acted as property manager of each of the Debtors through May 2018 when it was replaced by Kaplan Management Company, Inc. as further described below.

Each apartment complex offers amenities usually provided for Class "C" housing. Additionally, the Real Properties offer their respective residents use of a clubhouse, barbeque grill, swimming pool, gazebo, among other amenities and services.

SCLP owns the Seton Chase Apartment complex located at 7703 Seton Lake Drive, Houston, Harris County, Texas ("SCLP Property").  The multifamily apartment complex on the SCLP Property was built in 1983 and is categorized as a Class "C" complex.   The SC Property contains 232 units consisting of a mixture of one and two bedroom moderately priced units catering to a working-class community.  The apartments range from 476 sq. ft- 873 sq. ft, with average rents between $559 – $779.  On the Filing Date, occupancy rates at the SCLP Property were approximately 64%.   The occupancy rates have increased since the bankruptcy and are currently 68%.  As discussed more fully below, as of the Filing Date, SCLP asserts that the value of the SCLP Property is between $11,229,194 - $14,159,329.   Other assets of SCLP as of the Filing Date, include reserved claims against Debtor's insurer related to Hurricane Harvey Claims; reserved claims against Secured Lenders with unknown value related to lenders prepetition conduct (discussed more fully below) machinery, fixtures and equipment of $58,725, office furniture of $1,730, net A/R of $1,876, and cash of approximately $1,059,075 (most of which was held in various reserve accounts by the Secured Lender and is also an asset of WPLP).  As discussed below, a substantial portion of the cash held by the Secured Lenders has been utilized for payment of post-petition repairs made to address Life Safety Concerns and down payments for commercial insurance renewal.

WPLP owns the Willowbrook Point Apartment complex which is located at 14150 Tomball Parkway, Houston, TX, Houston, Harris County, Texas ("WPLP Property"). The SCLP Property and the WPLP Property are located approximately one mile apart. WP Apartments were built in 1982 and are categorized as a Class "C" complex.   The multifamily apartment complex on the WPLP Property contains 151 units consisting of a mixture of one and two bedroom moderately priced units ranging from 683 sq. ft- 1001 sq. ft, with average rents between $500 – $650.  On the Filing Date, occupancy rates at the WPLP Property were approximately 43%. Since the bankruptcy, occupancy rates have increased to approximately 48%.  As discussed more fully below, as of the Filing Date, WPLP asserts that the value of the WPLP Property is between $7,921,326 - $10,120,694.  Other assets of WPLP as of the Filing Date, include reserved claims against Debtor's insurer related to Hurricane Harvey Claims; reserved claims against Secured Lenders with unknown value related to lenders prepetition conduct (discussed more fully below); machinery, fixtures and equipment of $29,100, office furniture of $1,585, net A/R of $2,642, receivable from affiliated Debtor of $1,197,003 and cash of approximately $1,059,075 (most of which was held in various reserve accounts by the Secured Lender and is also an asset of SCLP).

CHLP owns the Crosswinds Apartment complex located at 14810 Crosswinds Dr, Houston, TX, Houston, Harris County, Texas ("CHLP Property"). The multifamily apartment complex on the CHLP Property was built in 1985 and is categorized as a Class "C" complex.

7

The CHLP contains 240 units consisting of a mixture of one and two bedroom moderately priced units ranging from 683 sq. ft- 1033 sq. ft, with average rents between $589 – $800.  The CHLP Property is located amongst lower income subsidized housing properties within an area that is also considered less safe and experiences a higher level of crime. On the Filing Date, occupancy rates at the CHLP Property were approximately 49%.   The occupancy rates have increased since the bankruptcy and are currently 52%.   As discussed more fully below, as of the Filing Date, CHLP asserts that the value of the CHLP Property is between $11,351,539 - $13,689,496.  Other assets of CHLP as of the Filing Date, include reserved claims against Debtor's insurer related to Hurricane Harvey Claims; reserved claims against Secured Lenders with unknown value related to lenders prepetition conduct (discussed more fully below); machinery, fixtures and equipment of $54,000, office furniture of $945, net A/R of $2,579, receivable from affiliated Debtor of $32,000 and cash of approximately $349,631 (most of which was held in various reserve accounts by the Secured Lender).

*b.*   <u>*Liabilities*</u>

Each Debtor's liabilities on the petition date are set forth on the respective Claims Analysis attached as Exhibit "B."  Generally, these liabilities consisted of the following:

<u>Secured Liabilities</u>

*(i)*   *SCLP and WPLP* - as more fully discussed herein, the secured lender with a lien on the SCLP Property and WPLP Property is RSS CGCMT2014GC23-TX, LLC.  As of the Filing Date, the principal balance owed to the Secured Lender is $12,155,552.  Both SCLP and WPLP are obligors on the debt owed to this lender. Upon information and belief, the Secured Lender may assert an outstanding balance owed on this loan in excess of $14 million, including accrued contract and default interest, a prepayment penalty, attorneys fees and other miscellaneous fees.  Other secured claims of SCLP include approximately $96,000 in undisputed mechanics and materialman's lien claims and accrued ad valorem property taxes for 2018 which are not yet due.   There are also numerous disputed mechanics and materialman's lien claims which have been paid or Debtor contends are not owed.   Other secured claims of WPLP include approximately $175,000 in undisputed mechanics and materialman's lien claims and accrued ad valorem property taxes for 2018 which are not yet due. There are also numerous disputed mechanics and materialman's lien claims which have been paid or Debtor contends are not owed.

*(ii)*   *CHLP* - as more fully discussed above, the secured lender with a lien on the CHLP Property is RSS WFRBS2014C24-TX CHLP, LLC.  As of the Filing Date, the principal balance owed to the Secured Lender is $7,108,631.  Upon information and belief, the Secured Lender may assert an outstanding balance owed on this loan in excess of $8.4 million, including accrued contract and default interest, a prepayment penalty, attorneys fees and other miscellaneous fees.   Other secured claims of CHLP include approximately $175,000 in undisputed mechanics and materialman's lien claims and accrued ad valorem property taxes for 2018 which are not yet due.   There are also numerous disputed mechanics and materialman's lien claims which have been paid or Debtor contends are not owed.

<u>Priority Tax Claims</u> – There are no known priority tax claims scheduled or filed against any of the Debtors.

8

Priority Non-Tax Claims – One priority claim of $1145 related to tenant deposits has been scheduled against SCLP.  No other priority non-tax claims have been filed against SCLP and no priority non-tax claims have been scheduled or filed against WPLP.  Priority claims related to tenant deposits totaling $2356 have been scheduled against CHLP. No other priority non-tax claims have been filed against CHLP.

General Unsecured Claims – SCLP's schedules and proofs of claims filed reflect approximately $2.5 million in general unsecured claims.  Of this amount, approximately $2.2 million is owed to affiliates for loans made to the Debtor.  The balance of the general unsecured debt amount consists of largely undisputed vendor debt.  WPLP's schedules and proofs of claims filed reflect approximately $1.2 million in general unsecured claims.   Of this amount, approximately $935,000 is owed to affiliates for loans made to the Debtor.  The balance of the general unsecured debt amount consists of largely undisputed vendor debt.  CHLP's schedules and proofs of claims filed reflect approximately $2 million in general unsecured claims.  Of this amount, approximately $1.77 million is owed to affiliates for loans made to the Debtor.  The balance of the general unsecured debt amount consists of largely undisputed vendor debt

To obtain greater detail about claims, please see the Claims Analysis of each Debtor attached as Exhibit "B."

Equity Interest – Prior to the petition date, the equity holders had contributed approximately $6 million of equity to the SCLP and WPLP. Prior to the petition date, equity holders of CHLP had contributed $3.5 million.

c.   Administrative Claims Analysis

Debtors April 2018 Monthly Operating Report reflect no post-petition liabilities owed by any of the Debtors.  No further administrative expenses are known, other than accrued professional fees.

Through the end of April 2018, the Debtors had collectively incurred attorneys' fees in the aggregate balance of $113,693.11, less the retainer paid of $86,230.00.  An additional $275,000 to $300,000 of professional fees is expected through confirmation of these cases.

**THE RIGHT OF THE DEBTORS TO OBJECT TO ANY CLAIM FILED IN ANY OF THESE CASES IS EXPRESSLY RESERVED. THE INCLUSION OF A CLAIM OR CLAIMS WITHIN THIS DISCLOSURE STATEMENT IS NOT AN ADMISSION REGARDING THE VALIDITY OR ALLOWANCE OF ANY CLAIM. YOU SHOULD NOT ASSUME THAT A VOTE FOR OR AGAINST THE PLAN WILL HAVE ANY AFFECT OF THE STATUS OF YOUR CLAIM. IF ANYONE SUGGESTS THAT THE STATUS OF YOUR CLAIM MAY BE AFFECTED BY YOUR VOTE, YOU SHOULD REPORT SUCH INCIDENT TO COUNSEL FOR THE DEBTORS IMMEDIATELY AS ANY SUCH SUGGESTION MAY VIOLATE TITLE 18.**

### 2.   FINANCIAL DIFFICULTIES AND RESTRUCTURING

*a.*   Disputed Secured Lenders Claims

In order to purchase the SCLP Property and WPLP Property, SCLP and WPLP raised $6,000,000 from investors and also arranged $8,330,000 in mortgage financing on the SCLP Property and the assumption of a $3,944,935 mortgage on the WPLP Property.  These debts were refinanced on or about June 19, 2014 with a loan from Rialto Mortgage Finance, LLC in the original principal balance of $12,330,000, with a stated maturity date of July 6, 2024 ("SC-WP Loan") and evidenced and secured by a Promissory Note, a Deed of Trust, Fixture Filing and Security Agreement, Assignment of Rents and Leases and related loan documents (collectively "SC-WP Loan Agreement").   The SC-WP Loan was subsequently transferred by Rialto Mortgage Finance, LLC to RSS CGCMT2014GC23-TX, LLC and is serviced by Rialto Capital Advisers, LLC (collectively "SC-WP Lender").   The SC-WP Loan is secured by liens on the assets of SCLP and WPLP, including liens on SCLP Property and the WPLP Property, along with rents generated from the same.

The SC-WP Loan requires monthly payments of accrued interest, along with monthly principal payments of $68,776, with any outstanding balance to be paid in full at maturity. Additionally, the SC-WP Loan requires the Debtors to escrow Reserve Funds for items such as property tax escrow, insurance, repair and replacement of capital items.  As of the Petition Date, the principal balance of the SC-WP Loan was $12,155,552.52, plus certain unpaid interest and other fees.  The SC-WP Lender contends that the SC-WP Loan payoff balance, through May 25, 2018, is $14,463,676.95, excluding attorney's fees, but including contract interest, default interest, a prepayment penalty, advances, and other miscellaneous charges.  SCLP and WPLP dispute this payoff balance and certain of the charges reflected above the principal balance and intend to seek appropriate relief from the Bankruptcy Court to determine the correct payoff amount.   SCLP and WPLP have not yet determined if the extent, validity and priority of the SC-WP Lender's liens are disputed.  As discussed below, SCLP and WPLP also have reserved claims against the SC-WP Lender, which may include a challenge to its liens on the SCLP Property and WPLP Property.

In order to purchase the CH Apartments, CHLP raised $3,500,000 from investors and also arranged $6,086,000 in mortgage financing on CH Apartments.   These debts were refinanced on or about September 23, 2014, with a loan from Rialto Mortgage Finance, LLC in the original principal balance of $7.2 million, with a stated maturity date of October 6, 2024 ("CHLP Loan") and evidenced and secured by a Promissory Note, a Deed of Trust, Fixture Filing and Security Agreement, Assignment of Rents and Leases and related loan documents (collectively "CHLP Loan Agreement").   The CHLP Loan was subsequently transferred by Rialto Mortgage Finance, LLC to RSS WFRBS2014C24-TX CHLP, LLC and is serviced by Rialto Capital Advisers, LLC (collectively "CHLP Lender").   The CHLP Loan is secured by a lien on the assets of CHLP, including a lien on the CHLP Property, along with rents generated from the same.

The CHLP Loan requires monthly payments of accrued interest, along with monthly principal payments of $38,827, with any outstanding balance to be paid in full at maturity. Additionally, the CHLP Loan requires the Debtor to escrow Reserve Funds for items such as

property tax escrow, insurance, repair and replacement of capital item.  As of the Petition Date, the principal balance of the CHLP Loan was $7,108,631.28.  The CHLP Lender contends that the CHLP Loan payoff balance, through May 25, 2018, is 8,448,197.60, excluding attorney's fees, but including contract interest, default interest, a prepayment penalty, advances, and other miscellaneous charges.  CHLP disputes this payoff balance and certain of the charges reflected above the principal balance and intend to seek appropriate relief from the Bankruptcy Court to determine the correct payoff amount. CHLP has not yet determined if the extent, validity and priority of the CHLP Lender's lien is disputed.  As discussed below, CHLP has also reserved claims against the CHLP Lender which may include a challenge to its lien on the CHLP Property.

Secured Lenders have not filed proofs of claim at this time, which are due by July 9, 2018, but the Secured Lenders allege the correct outstanding balance is reflected on Exhibit K, attached hereto.  As further discussed below, Debtors assert that they have potential claims against the Secured Lenders for withholding access to funds and dispute the alleged amount owing including, but not limited to, the prepayment penalties.

### b.   LOANS FROM AFFILIATES

Each of the Real Properties was acquired at the peak of the real estate boom and unfortunately the market downturn had a severe impact the areas surrounding the Debtors locations.  This caused major distress to the operations of the properties and resulted in operational losses for all of properties and erosion of their value. In order fund operations and capital improvements on the properties, affiliated entities provided requisite funding.  As discussed below, as of the Filing Date, aggregate loans from affiliates exceeded $9.2 million.

Jaymor USA, Inc. ("Jaymor") is an affiliated entity, which has no ownership interest in the Debtors, but shares some common ownership in that Fabrizio Lucchese retains a 50% ownership interest in Jaymor.  From 2007 through 2013, Jaymor provided funding to the Debtors through their respective financing partnerships pursuant to three Demand Promissory Grid Notes (collectively "Jaymor Grid Notes", separately each a "Jaymor Grid Note").  The Jaymor Grid Notes are payable on demand.  As of the Filing Date, the aggregate balance owed with respect to the Jaymor Grid Notes is $5,725,707, including principal in the amount of $2,640,135, plus unpaid aggregate interest in the amount $3,085,572.  Below is a summary of the Jaymor Grid Notes.

- On July 31, 2007, Jaymor entered into the first Jaymor Grid Note, a Demand Promissory Grid Note with CFLP to provide funding to CHLP, from time to time, as needed, for operations and capital improvements.  Interest is payable at .0411% daily.  As of the Filing Date, the outstanding balance owed on this note is $2,641,070, including an unpaid principal balance of funds advanced in the amount of $1,051,210, plus unpaid, accrued interest of $1,589,860.

- Further, on January 31, 2008, Jaymor entered into the second Jaymor Grid Note, a Demand Promissory Grid Note with SWLP to provide funding to WPLP, from time to time, as needed, for operations and capital improvements.  Interest is payable at .0411% daily.  As of the Filing Date, the outstanding balance owed on

this note is $2,256,824, including an unpaid principal balance of funds advanced in the amount of $1,131,413, plus unpaid, accrued interest of $1,125,411.

- Moreover, on June 30, 2008, Jaymor entered into the third and final Jaymor Grid Note, a Demand Promissory Grid Note with SWLP to provide funding to SCLP, from time to time, as needed, for operations and capital improvements. Interest is payable at .0411% daily. As of the Filing Date, the outstanding balance owed on this note is $827,813, including an unpaid principal balance of funds advanced in the amount of $457,512.48, plus unpaid, accrued interest of $370,300.66.

Beginning in 2012, additional funding to the Debtors was made by various affiliated entities and entered into directly with each Debtor entity pursuant to various Demand Promissory Grid Notes (collectively "Affiliate Grid Notes"). The Affiliate Grid Notes provide that the affiliated entity advance funds to the respective Debtor, from time to time, as needed, for operations and capital improvements. The Affiliate Grid Notes are payable on demand and without interest. A summary of the principal balance owed with respect to each the Affiliate Grid Notes is contained in the table below:

| Affiliate Lender | CHLP | WPLP | SCLP | | Total |
|---|---|---|---|---|---|
| | | | | | |
| **Jaymor Asset Management, Inc.** | | | | | |
| Date of First Advance | Jan 31/13 | Apr 29/13 | May 10/16 | | |
| Principal Balance owed at Mar 5/18 | $ 717,869.23 | $ 476,043.16 | $ 603,903.45 | | $ 1,797,815.84 |
| | | | | | |
| **Master Building Contractors, LLC** | | | | | |
| Date of First Advance | Apr 30/13 | Aug 21/13 | Jan 31/15 | | |
| Principal Balance owed at Mar 5/18 | $ 670,000.00 | $ 170,931.75 | $ 124,191.68 | | $ 965,123.43 |
| | | | | | |
| **Amaryco, Inc.** | | | | | |
| Date of First Advance | Sept 1/16 | Feb 13/17 | July 19/17 | | |
| Principal Balance owed at Mar 5/18 | $ 92,000.00 | $ 27,300.00 | $ 61,000.00 | | $ 180,300.00 |
| | | | | | |
| **Jaymor USA Inc.** | | | | | |
| Date of First Advance | Jan 31/12 | Jul 23/15 | Apr 30/14 | | |
| Principal Balance owed at Mar 5/18 | $ 93,208.78 | $ 75,303.99 | $ 83,165.00 | | $ 251,677.77 |
| | | | | | |
| **Jaymor Securities Ltd.** | | | | | |
| Date of First Advance | Feb 17/16 | Jun 30/14 | May 11/17 | | |
| Principal Balance owed at Mar 5/18 | $ 21,020.00 | $ 32,855.84 | $ 15,020.00 | | $ 68,895.84 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Fabco Holdings Inc.** | | | | | | | |
| Date of First Advance | Mar 2/18 | | Mar 2/18 | | Mar 2/18 | | |
| Principal Balance owed at Mar 5/18 | $ 33,333.33 | | $ 33,333.33 | | $ 33,333.33 | | $ 99,999.99 |
| | | | | | | | |
| **W Point Limited Partnership** | | | | | | | |
| Date of First Advance | Sep 21/16 | | - | | Mar 25/15 | | |
| Principal Balance owed at Mar 5/18 | $ 15,250.00 | | 0 | | $ 1,181,753.19 | | $ 73,350.00 |
| | | | | | | | |
| **S Chase Limited Partnership** | | | | | | | |
| Date of First Advance | Jan 21/16 | | Sep 29/15 | | - | | |
| Principal Balance owed at Mar 5/18 | $ 69,500.00 | | $ 85,850.00 | | 0 | | $ 155,350.00 |
| | | | | | | | |
| **Crosswinds Houston Limited Partnership** | | | | | | | |
| Date of First Advance | | | | | Mar 14/16 | | |
| Principal Balance owed at Mar 5/18 | | | | | $ 32,000.00 | | $ 32,000.00 |
| | | | | | | | |
| **TOTAL** | **$ 1,712,181.34** | | **$ 901,618.07** | | **$ 2,134,366.65** | | **$ 3,592,512.87** |

The Jaymor Grid Notes and Affiliated Grid Notes have not been paid and remain due and owing. In addition to the Jaymor Grid Notes and Affiliated Grid Notes, the following aggregate unsecured advances have been made to the Debtors by Affiliates:

| Affiliate Lender | CHLP | | WPLP | | SCLP | | Total |
|---|---|---|---|---|---|---|---|
| Jaymor Asset Management, Inc. | $49,007.51 | | $ 33,779.18 | | $66,535.18 | | $149,321.87 |
| S Chase Limited Partnership | $8,985.00 | | | | | | $8,985.00 |
| TOTAL | $57,992.51 | | $ 33,779.18 | | $66,535.18 | | $158,306.87 |

c.   Events Leading to Bankruptcy

As mentioned above, each of the Real Properties was acquired at the peak of the real estate boom and unfortunately the market downturn had a severe impact the areas surrounding the Debtors locations. This caused major distress to the operations of each of the properties and resulted in operational losses for all of properties and erosion of their value. This resulted

in litigation against the Debtors primarily related to unpaid vendor debt, including various creditors asserting M&M Lien claims[2].

Since 2007, affiliated entities provided over $9.2 million in funding to the Debtors to help cover operational expenses and improvements. To further exacerbate the Debtors financial situation, beginning in the spring of 2017, the Secured Lenders required each of the Debtors to remit all rents to lockboxes held by the lenders and refused to release any funds for operations or repairs of the properties.  Lacking funds for capital expenditures, the properties sustained further disrepair and physical degradation, resulting in a significant decline in occupancy rates. With occupancy levels and property conditions declining, Debtors were forced to offer rent concessions to attract tenants to the properties.  A resulting effect was increased crime and vandalism at the properties, making them less attractive to the core tenant constituency occupying each of the premises. In July 2017, loans were placed in special servicing by the Secured Lenders. Ultimately, each the apartment complexes accumulated substantial financial losses.  During this period, related entities to the Debtors advanced approximately $975,000, of which $134,000 was in February 2018, to cover operational shortfalls, with the understanding that the Secured Lenders would work with the Debtors to restructure the loans. As of the Filing Date, the Secured Lenders held approximately $1.2 million of Debtors funds in various reserve accounts.

To further exacerbate the situation, Hurricane Harvey caused damage to all complexes including water damage to several units which need to be completely gutted and repaired. Although insurance claims were filed, insurers initially claimed that repair costs were less than the Debtors policy deductible and did not make payment. The Debtors contested this finding and the while the insurers have increased the proposed payment, the amounts offered are wholly insufficient to cover the necessary repairs and barely exceed the policy deductibles. The Debtors continue to dispute the proposed payment amounts and remain in discussion with the insurer.

Additionally, in the fall of 2017, SCGP, WPGP and CGP each petitioned the limited partners of the respective Debtor in support of a capital call to fund improvements to and rehab of the properties.  The limited partners of SCLP and WPLP were petitioned to support a capital call in the aggregate amount of $2.8 MM by way of special resolution and the limited partners of CHLP were petitioned to support a capital call in the amount of $1.4 MM. Unfortunately, the resolutions were not supported and the capital call failed.   Due to the lack

---

[2] Presto Maintenance Supply ("Presto") has asserted M&M Lien claims against each of the Debtors, some of which are disputed. Presto has transferred its claims to BCDR Investors, L.P. ("BCDR").  Upon information and belief, Gary M. Gray is president of the general partner of BCDR.  Although a motion to sell the Real Properties has not been filed with the Bankruptcy Court, BCDR has filed a notice of proposed offer to purchase the Real Properties and has been an active participant in these cases.   Prior to the Petition Date, Gary M. Gray and WRDR Investors, LP alleged to have purchased the CHLP Property for $30,000 at sale conducted by a receiver in connection with Cause No. 1058414, in Harris County Court at Law No. 3, styled as *Star Personnel, Inc. v. Texas Regency Apartments L.P. et al*, related to judgments against CHLP and Jaymor totaling less than $60,000.  CHLP and Jaymor were unaware of the underlying litigation and orders and first learned of the alleged sale to Mr. Gray for $30,000 on December 13, 2017 when Mr. Gray entered the CHLP Property and attempted a takeover of the property.  CHLP subsequently obtained a TRO enjoining Mr. Gray and WRDR Investors, LP from entering the CHLP Property and obtained a new trial on the underlying judgement. Thereafter, CHLP deposited $30,000 into the Court registry, which was subsequently paid to Mr. Gray and WRDR Investors, LP to resolve the litigation.

14

of funds, Orion advanced more than $180,00 in payroll costs for the Debtors during this period (from October 2017-February 2018).

In the fall of 2017, the Debtors engaged Houston Income Properties, Inc. ("Broker") to source an equity partner to inject needed capital into the properties. In December 2017, the Broker provided Broker's Pricing Opinion on each of the properties as follows:

|  | Current Value (Oct 2017) | Stabilized Value |
|---|---|---|
| SCLP (Seton Chase Apartments) | $11,229,194 | $14,159,329 |
| CHLP (Crosswinds Houston Apartments) | $11,351,539 | $13,689,496 |
| WPLP (Willowbrook Point Apartments) | $7,921,326 | $10,120,694 |

Subsequently, the Broker located Juniper Investments Group ("Juniper") as a prospective purchaser of the properties. Upon information and belief, Juniper is a vertically integrated investment, asset and property management company founded in 2000 and whose focus is the acquisition of Class B and C multi-family properties. Since its inception, Juniper has acquired more than 23,000 units in 14 states at a cost of over $900 million. As of 2017, Juniper's portfolio consists of 50 properties located in 5 states with more than 9500 units and an aggregate market value of nearly $500 million.

In February 2018, the Debtors entered into a purchase and sale with Juniper, whereby Juniper would invest $6.9 million in the projects for capital improvement and assume the secured debt. The Secured Lenders indicated a willingness to consider the offer from Juniper and began required due diligence. However, the properties were posted for foreclosure on March 6, 2018 and the Secured Lenders had not yet approved the purchase offer and debt assumption from Juniper. The Debtors requested that Secured Lenders postpone the foreclosure to allow the purchase process to continue. The Secured Lenders refused to postpone the foreclosure absent entry of a forbearance agreement which would require the Debtors to concede disputed loan provisions, including, but not limited to, imposition of almost $3 million in penalties, convert the loans from non-recourse to recourse and provide for a release all claims held by the Debtors against the Secured Lenders, including, but not limited to, claims related to lenders failure to release any of the $1.2 million in funds held to cover expenses or repairs to the properties. Further, the forbearance required that the proposed purchaser escrow a deposit of almost $6 million in accounts held by the lenders. These conditions for forbearance were untenable to the Debtors, thereby prompting the filing of these Chapter 11 cases.

*d.*   Claims against Secured Lenders

As described above, during 2017, the Secured Lenders wrongfully withheld all of Debtors' revenue and refused to release any portion of the same to fund improvements, repairs or operations. Affiliates of the Debtors infused significant funds to maintain the

properties and the Secured Lenders refused to reimburse any repairs that were made. This lack of cash ultimately resulted in the continued deterioration of the properties and decreased occupancy rates and ultimately led to the filing of these Chapter 11 cases. Further, Secured Lenders have asserted significant claims for prepayment penalties, including a penalty in excess of $1.5 million related to the SC-WP Loan and $826,000 related to the CHLP Loan. The Debtors dispute the validity of these penalties and further assert that but for Secured Lenders actions, the loans would be in good standing and no penalty would be alleged due.

The Debtors intend to assert claims against the Secured Lenders, including, but not limited to, potential claims arising from bad faith efforts to prevent mitigation of damages to property and/or lender; bad faith efforts apparently taken to attempt to get debtor to execute a forbearance to convert loans from non-recourse to recourse; claims relating to failure to allow use of reserve funds for repairs to property; validity of prepayment penalties and/or any other claims which may be discovered related to the Lender's relationship with a Debtor and/or efforts to control actions of any of the Debtors.    The Debtors have not yet determined if the extent, validity and priority of the Secured Lender's liens are disputed and reserve the right to challenge these liens.

3.    FINANCIAL SITUATION AS OF PETITION DATE

As mentioned above, the collective principal balance of Debtors' secured indebtedness to the Secured Lenders is approximately $19.2 million, plus certain accrued, unpaid interest and other charges.  The Secured Lenders have claimed liens on substantially all of Debtors' assets. SCLP also has reported undisputed M&M Liens of approximately $96,000, general unsecured trade debt of approximately $296,000, plus an additional $2.2 million in unsecured obligations owed by this Debtor to affiliates.  The trade debt obligations are owed to approximately 30 trade creditors.  WPLP has reported undisputed M&M Liens of approximately $176,000, general unsecured trade debt of approximately $276,000, plus an additional $935,000 in unsecured obligations owed by this Debtor to affiliates.    The trade debt obligations are owed to approximately 36 trade creditors.  CHLP has reported undisputed M&M Liens of approximately $169,000, general unsecured trade debt of approximately $290,000, plus an additional $1.77 million in unsecured obligations owed by this Debtor to affiliates.  The trade debt obligations are owed to approximately 31 trade creditors.  The Debtors have no employees as the Real Properties are currently is managed by Kaplan Management, Inc.  As further discussed above, the occupancy rates at all of the properties have increased since the Petition Date.  In order to improve occupancy, rent is currently being offered at below market rates.

4.    OWNERSHIP AND MANAGEMENT

SCLP, CHLP and WPLP are each Florida limited partnerships authorized to conduct business in Texas.  The Debtors were each organized in 2007 under the laws of the State of Florida and registered to conduct business in Texas on or about December 3, 2007.  The Debtors were each formed to acquire, own, maintain, lease and otherwise deal with multifamily apartment communities in the Houston Metropolitan Area.  Each Debtor is managed by its general partner.

16

SCLP is managed by S Chase General Partner, Inc. ("SCGP"). SCGP is a special purpose entity formed to manage SCLP and is authorized to conduct business in Texas. SCGP retains a 1% interest in SCLP. Michael Johns is Director and President of SCGP and Fabrizio Lucchese is its 100% shareholder. Seton Willow Financing Partnership, Ltd., a Florida limited partnership ("SWLP"), owns the remaining 99% limited partnership interest in SCLP.

WPLP is managed by W Point General Partner ("WPGP"). WPGP is a special purpose entity formed to manage WPLP and is authorized to conduct business in Texas. WPGP retains a 1% interest in WPLP. Michael Johns is Director and President of WPGP and Fabrizio Lucchese is its 100% shareholder. SWLP owns the remaining 99% limited partnership interest in WPLP.

Fabrizio Lucchese is President of SWLP. SWLP is owned 1% by Seton Willow Financing GP, Inc., its general partner, whose sole shareholder is Fabrizio Lucchese, and 99% by Seton Willow Limited Partner. Seton Willow Limited Partner is owned 1% by Seton Willow (Ontario) General Partner, Inc., its general partner, a Canadian partnership. whose sole shareholder is Fabrizio Lucchese, and 99% by various investors, none of which holds more than a 20% limited partnership interest in Seton Limited Partner.

CHLP is managed by Crosswinds General Partner, Inc. ("CGP"). CGP is a special purpose entity formed to manage CHLP and is authorized to conduct business in Texas. CGP retains a 1% interest in CHLP. Michael Johns is Director and President of CGP. Crosswinds Financing Partnership Ltd., a Florida limited partnership "CFLP"), owns the remaining 99% limited partnership interest in CHLP. Fabrizio Lucchese is President of CFLP. CFLP is owned 1% by Crosswinds Financing GP, Inc., its general partner, whose sole shareholder is Fabrizio Lucchese, and 99% by Crosswinds Limited Partner. Crosswinds Limited Partner is owned 1% by Crosswinds (Ontario) General Partner, Inc,, a Canadian partnership, its general partner, whose sole shareholder is Fabrizio Lucchese, and 99% by various investors, none of which holds more than a 20% limited partnership interest in Crosswinds Limited Partner.

An organizational chart reflecting the structure and ownership of each of the Debtors and related entities is attached hereto as Exhibit C.

5.   SIGNIFICANT ACTIONS IN BANKRUPTCY CASE

*a.*   Voluntary Petition Filing

The Debtors continue to operate as a debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code and are authorized to operate their business and manage their property in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval. To date, an official committee of unsecured creditors has not been appointed. An immediate effect of the filing of the Debtors' bankruptcy petitions is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of Liens against property of the Debtors, and the continuation of litigation against the Debtors. The relief provided the Debtors with the "breathing room" necessary to reorganize its business and prevents creditors from obtaining an unfair recovery advantage while the Chapter 11 Cases are ongoing.

*b.*   Administration – "First Day" Motions

Shortly after the first day of the Chapter 11 Cases, the Debtors filed several motions seeking relief by virtue of so-called "first day motions."   First day motions are intended to facilitate the transition between a debtor's pre-petition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the bankruptcy court.  The first day orders the Debtors obtained in these jointly administered Chapter 11 Cases, which are typical of orders entered in business reorganization cases across the country, authorize, among other things, payment of pre-petition wages, continued use of cash collateral, and joint administration of the Debtors' bankruptcy cases.

*c.*   Retention of Professionals.

The Debtors retained Hoover Slovacek LLP as their bankruptcy counsel on an hourly fee basis.  As further discussed below, the Debtors also retained Kaplan Management Corporation as (i) Property Manager for the Real Properties, with a fee based on a percentage of collections and subject to a contractual cap and (ii) Construction Manager, with a fee based on a percentage of work approved and performed.

*d.*   Appointment of Examiner and Examiners Report

During the hearing on the "First Day" Motions, the Court, on its own motion, entered an order requiring the Office of the United States Trustee to appoint an examiner under 11 U.S.C. §1104(c) to investigate whether the Debtors apartment properties comply with applicable federal, state and local laws concerning the health, safety and welfare of the residents or the public at the three properties.   The order required that the examiner file a report, by March 21, 2018, identifying any health, safety, or welfare concerns found on each property and, if found, recommend a course of action to promptly protect the health, safety and welfare of the residents or public. Bryon A. Parffrey was appointed as examiner.   The examiner subsequently filed a report detailing his findings regarding various health, safety and welfare concerns on each of the properties.   The Court found that Mr. Parffrey had fulfilled his requirements and was released from his appointment.   The Court further approved payment of fees to the examiner in the aggregate amount of $19,485.

*e.*   Resolution of Health Safety Welfare Concerns

At the hearing to determine whether further work by the examiner was appropriate, numerous health, safety and welfare concerns requiring attention were identified ("HSW Concerns").   The most significant HSW Concerns included exposed electrical wiring; potential gas leaks; building stabilization; fencing around pool areas; mold remediation; unsafe stairs, railing, and balconies at all the properties.  The Debtors and Secured Lenders proposed a course of conduct to implement emergency repairs at the properties. The contemplated repairs were expected to require substantial costs to complete.  Upon information and belief, as of the Petition Date, the Secured Lenders were holding more than $1 million in aggregate in the various reserve accounts for the SC-WP Loan and CHLP Loan.  The Secured Lenders agreed to assist in certain emergency conduct and to fund that conduct from the funds held in the reserve accounts.

The Court entered an order authorizing and requiring emergency actions which authorized the Debtors to take all actions necessary to protect the health, safety and welfare of the property residents and of the public.  The Bankruptcy Court emphasized that the first issues to address concern the health, safety and welfare of the residents and the public and any diversion of attention from those issues should be undertaken with great caution and would be met with skepticism by the Bankruptcy Court, concluding that such issues would be best addressed after a comprehensive plan for stabilizing the properties has been commenced.

Subsequently, after interviewing numerous candidates, the Debtors and Secured Lenders agreed to the engagement of Kaplan Management, Inc. ("Kaplan") as both the Construction Manager to coordinate and supervise required repairs and Property Manager to manage the properties.  Thereafter, Kaplan proceeded to commence the required repairs which are ongoing. A hearing to determine if the immediate health, safety and welfare issues have been resolved is scheduled for June 22, 2018 at 9:15 a.m. (CST).

During the pendency of these cases, the Debtors filed several status reports detailing the ongoing property conditions and status of repairs.  Copies of each of the status reports, without attachments, is attached hereto as Exhibit "D".  Copies of the attachments to the status reports are not included herewith but can be found on the Bankruptcy Court's docket or by contacting counsel for the Debtors.

   f.   The Marketing and Sales Process

During the months prior to the Petition Date, the Debtors engaged in extensive discussions and marketing attempts with various parties regarding a possible joint venture or the sale of assets and engaged Houston Income Properties, Inc. as the broker to effectuate this process. As stated above, Juniper submitted an offer to purchase the properties and assume the Secured Lenders debt.  Unfortunately, the Secured Lenders refused to postpone a scheduled March 2018 foreclosure in order to allow the assumption process to be completed and resulting in the filing of these Chapter 11 Cases.

The Debtors have determined that pursuing an expedited sales and auction process is the best strategy to maximize the value of the ongoing business operations.  In this process, the Debtors may elect to seek approval of a Stalking Horse Bidder.  To this end, the Debtors and Secured Lenders have agreed upon the following timelines regarding the sale process which commence once the Bankruptcy Court enters an order determining that immediate health, safety and welfare concerns have been resolved at the properties ("HSW Order"):

   (i)   Within fourteen (14) days after the entry of the HSW Order, the Debtors shall file a motion seeking approval to engage a real estate broker to market and sell the Real Properties;

   (ii)  Within fourteen (14) days after the entry of the HSW Order, the Debtors shall file a motion seeking approval of bid procedures and the sale of the Real Properties;

(iii) Within twenty (21) days after entry of the HSW Order, Debtors shall commence establishing a data room containing information sufficient for interested parties to perform necessary financial due diligence in connection with the sale of the Real Properties;

(iv) Within ninety (90) days after entry of the HSW Order, the Bankruptcy Court shall have entered an Order approving the sale of the Real Properties.

These deadlines are also included in the Second Agreed Stipulation and Interim Cash Collateral Order entered on May 7, 2018. The Debtors anticipate seeking approval of Houston Income Properties, Inc. to act as broker for the sale of the Real Properties. Additionally, in the Sale Motion, the Debtors contemplate seeking Bankruptcy Court approval of bidding procedures similar to those attached hereto as Exhibit "E". During the pendency of these cases, Juniper and BCDR have both expressed interest in purchasing the properties and becoming a Stalking Horse Bidder. BCDR has also filed with the Bankruptcy Court a Notice of Proposed Offer.

*g.*   Orion Contract Rejection

Prior to the Petition Date, Orion Property Group, LLC ("Orion") served as the property manager for each of the Debtors. In connection with the health safety welfare repairs, the Debtors and Secured Lender agreed to the engagement of Kaplan as a replacement property manager. The transition of the business operations from Orion to Kaplan was completed effective May 31, 2018. The Debtors have filed a motion seeking to reject the contracts with Orion effective May 31, 2018. This motion is currently pending before the Bankruptcy Court.

*h.*   Proposed DIP Financing and Roof Repairs

According to records provided by the Secured Lenders, approximately $1.2 million in aggregate was held in the various reserve accounts related to the SC-WP Loan and CHLP Loan. As of May 23, 2018, approximately 50% of the aggregate total has been funded or allocated to repairs to correct HSW Concerns and additional repairs are required and ongoing. A concern exists that the funds held in the reserve accounts may be insufficient to cover the costs of all the necessary repairs related to HSW Concerns. In particular, buildings on each of the properties require significant roof repairs, potentially costing close to $1 million for all three properties to replace all roofs. Many of the buildings have leaky roofs. If these are not repaired, any interior renovations or repairs made to affected units stand to be ruined by weather exposure.

The roofs at the SCLP Property and WPLP Property are old and in need of full replacement. The roofs at the CHLP Property were replaced in the fall of 2014 by Delaney's Restoration, Inc. aka Delaney's Roofing ("Delaney's"). The Debtors intend to pursue claims against Delaney relative to this work. Repair of the roofs would amount to temporary patching which is anticipated to last for a few months at best. Patching is less expensive than full replacement and will need to be repaired or replaced again in the short term. Additionally, patching is less likely to be sustained if Houston experiences significant weather events during this hurricane season.

At the Status Conference held on May 29, 2018, the Court requested that, at the next status conference, Juniper and BCDR each address their opinion as to whether the roofs at the Real Properties should be repaired or replaced. Thereafter, at the status conference held on June 8, 2018, Juniper indicated that the roofs at the SCLP Property and WPLP Property should each be replaced and the roofs at the CHLP Property be repaired. BCDR indicated that the roofs at all properties should be repaired.

Debtors have received inquiries from several parties indicating a willingness to provide DIP financing and have discussed general terms with several parties. To date, Debtors have received terms sheets for DIP financing from BCDR and Juniper. While both proposals offer identical funding amounts ($2 million), the terms offered by Juniper are more favorable to the Debtors, including lower rates of interest. A copy of the proposed DIP Term Sheet from Juniper is attached hereto as Exhibit "F". To the extent that funds from the reserve accounts are insufficient to cover the required repair costs, the Debtors shall seek Bankruptcy Court approval of the DIP Facility proposed by Juniper as provided in the DIP Term Sheet.

   *i.*   Adversary Proceeding Against BCDR and Presto

On May 25, 2018, the Debtors initiated Adversary Proceeding No. 18-031016, styled as *S Chase Limited Partnership et al. v. BCDR Investors, LP and Presto Drapery Services, Inc. d/b/a/ Presto Maintenance Supply, Inc*., in the Bankruptcy Court seeking to avoid certain transfers under 11 U.S.C. §§547, 548 & 550 and under the Texas Uniform Fraudulent Transfer Act. A summons was issued on May 30, 2018. A copy of the complaint initiating this proceeding is attached hereto as Exhibit "G".[3] Due to their voluminous nature, exhibits to the complaint have been omitted. For copies of these exhibits, please refer to the Court docket or contact counsel for the Debtors.

   *j.*   Claims Bar Date.

For all Debtors, the last date to file a proof of claim is July 9, 2018. The last day for any governmental units to file a proof of claim is September 10, 2018.

   *k.*   Future Operations and Management

The Debtors shall continue to operate in the normal manner through the Effective Date of the Plan. Kaplan shall remain as Property Manager of the Real Properties through the Closing Date. The general partner of each Debtor shall continue to manage each respective Debtor. Gord Steele shall remain as the Chief Financial Officer of each of the Debtors' general partners. After the Effective Date, the Debtors will continue to operate solely in order to distribute the funds necessary to make payments to Creditors holding administrative Claims, pursue Reserved Litigation Claims and to engage in the Claims resolution process pursuant to Article 7 of the Plan.

---

[3] Debtors are preparing an Amended Complaint against BCDR Investors, LP and Presto Drapery Services, Inc. d/b/a/ Presto Maintenance Supply, Inc. to assert additional allegations and/or causes of action. Exhibit "G" will be supplemented upon filing of the Amended Complaint.

### C.   **Case Management Going Forward**

#### 1. PLAN NEGOTIATIONS

The Debtors have an exclusive period within which they each may propose a plan of reorganization and are proposing the Plan within that period.  Before submitting the current Plan, the Debtors negotiated the use of Cash Collateral with Secured Lenders and advised Secured Lenders of the Debtors' intention to sell the Real Properties.

#### 2. ASSUMPTION AND REJECTION

The bankruptcy law allows the Debtors to assume or reject any pending lease agreements or executory contracts that exist on the date of the order for relief.  Additionally, the law provides that the Debtors can assign their respective interest in lease agreements and executory contracts provided they cure all defaults and provide adequate assurance that the assignee will comply with the terms of the lease or contract.  Executory contract and lease assumption and rejection are treated in the Plan.  Any contract or lease not specifically assumed in the Plan, or by prior court order, is deemed rejected.  Through the Plan and/or a Motion to Sell the Property, the Debtors are seeking to assume and assign all the residential lease agreements to the purchaser of the Real Properties.

## V.   **DESCRIPTION OF PLAN**

### SUMMARY OF THE PLAN OF REORGANIZATION

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.**

### A.    Overall Structure of the Plan

Subject to all other applicable provisions of the Plan (including its distribution provisions), classified Claims and Interests shall receive the treatment set forth below.  Except as otherwise provided herein, the Plan will not provide any distributions on account of a Claim or Interest to the extent that such Claim or Interest has been disallowed, released, withdrawn, waived, settled, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third party guarantors, sureties, or insurers, whether governmental or nongovernmental. Except as otherwise provided herein, the Plan will not provide any distributions on account of a Claim or Interest, the payment of which has been assumed by a third party.

The Debtors' Plan provides for the liquidation of each of the Debtors' through a sale of the Real Properties.  The attached Bidding Procedures are similar to those to be filed with the Sale Motion (as further described above) and describe the procedures to be used to market and solicit qualified bids on the Real Properties, and the auction procedures to be used if there are competing qualifying bids.

Generally, if the Plan is confirmed by the Bankruptcy Court and consummated: (1) Allowed Administrative Claims will be paid in Cash in full unless otherwise agreed; (2) Allowed Non-Tax Priority Claims will be paid in full in Cash unless otherwise agreed; (3) Allowed Priority Tax Claims will be paid in full from the respective Debtors' Net Sale Proceeds; (4) Allowed Secured Claims of M&M Lienholders shall be paid in full from the Net Sales Proceeds of the respective Debtor; (5) Allowed Secured Claim of  RSS CGCMT2014GC23-TX and RSS WFRBS2014C24-TX shall be paid from Net Sale Proceeds of the respective Debtor until the balance of the Allowed Claim is paid in full; (6) Holders of Allowed General Unsecured Claims will be paid a pro rata share of the respective Debtors' Net Sale Proceeds after payment in full of Allowed Class 1 and Allowed Class 2 Claims, along with a pro rata share of Net Litigation Proceeds; (7) Holders of Allowed Claims of Insiders & Affiliates shall be allowed to offset any amount owed by a Debtor, and, with respect to the balance of the Allowed Class 4 Claim, shall receive a pro rata share of Net Sale Proceeds and Net Litigation Proceeds for the respective Debtor after payment in full of Allowed Class 1, 2 and 3 Claims; and (8) Equity Interest Holders shall receive no distribution or any property under the Plan on account of said Interests until Allowed Class 1, Class 2, Class 3, Class 4,  and Class 5 are paid as provided under the terms of this Plan.

The Effective Date of the Plan is the later of (i) fourteen (14) days after the Confirmation Order becomes a Final Order, (ii) the date upon which all conditions precedent to the effectiveness of the Plan set forth in Article 10 of the Plan have been fulfilled or waived.

### B.    Administrative Expenses and Timing of Payment

1.    ADMINISTRATIVE CLAIMS BAR DATE.

Any Holder of an Administrative Claim (including any cure Claims for Executory Contracts or leases that are assumed pursuant to this Plan) against the Debtors, except for administrative expenses incurred in the ordinary course of operating the Debtors' business or allowed by prior order of the Bankruptcy Court, shall file an application for payment of such

Administrative Claim on or within sixty (60) days after entry of the Confirmation Order with actual service upon counsel for the Debtors, otherwise such Holder's Administrative Claim will be forever barred and extinguished and such Holder shall, with respect to any such Administrative Claim, be entitled to no distribution and no further notices. The Debtors shall pay pre-confirmation quarterly U.S. Trustee fees in full in Cash within thirty (30) days after the Effective Date. U.S. Trustee fees which accrue after confirmation shall be paid by the Disbursing Agent until the case is closed or converted.

2. PAYMENT OF ADMINISTRATIVE CLAIMS.

Each Holder of an unpaid Allowed Administrative Claim or Allowed Priority Claim shall be paid in Cash, in full, from the Other Assets or Net Sale Proceeds, prior to any distribution to Allowed Class 1, Class 2, Class 3, and Class 4 Class Claims, attributable to the respective Debtor against which the claim is asserted on the later of fourteen (14) days after the Effective Date or the date such Claim becomes an Allowed Administrative Claim, unless the Holder of such Claim agrees to a different treatment.

C. **Classes of Secured, Priority, and Unsecured Claims and Treatment of Interests**

Class 1.    Allowed Secured Claims of M&M Lienholders.

Classification. Class 1A consists of all Allowed Secured Claims of M&M Lienholders against SCLP.

Classification. Class 1B consists of all Allowed Secured Claims of M&M Lienholders against WPLP.

Classification. Class 1C consists of all Allowed Secured Claims of M&M Lienholders against CHLP.

Treatment.

(i) Allowed Class 1A Secured Claims of M&M Lienholders shall be paid in full, without interest, from the SCLP Net Sale Proceeds on the later of fourteen (14) business days after the Effective Date or ten (10) Business Days after a Final Order allowing the Allowed Secured Claim.

(ii) Allowed Class 1B Secured Claims of M&M Lienholders shall be paid in full, without interest, from the WPLP Net Sale Proceeds on the later of fourteen (14) business days after the Effective Date or ten (10) Business Days after a Final Order allowing the Allowed Secured Claim.

(iii) Allowed Class 1C, Secured Claims of M&M Lienholders shall be paid in full, without interest, from the CHLP Net Sale Proceeds on the later of fourteen (14) business days after the Effective Date or ten (10) Business Days after a Final Order allowing the Allowed Secured Claim.

Impairment. The Class 1A, 1B and 1C Claims are impaired.

24

Class 2.        Allowed Secured Claims of RSS CGCMT2014GC23-TX and RSS WFRBS2014C24-TX.

Classification.   Class 2A consists of the Allowed Secured Claim of RSS CGCMT2014GC23-TX against SCLP and WPLP, with an outstanding principal balance of $12,155,551.52.

Classification.   Class 2B consists of the Allowed Secured Claim of RSS WFRBS2014C24-TX against CHLP, with an outstanding principal balance of $7,108,631.28.

Treatment.

(i)  Allowed Class 2A Secured Claim of RSS CGCMT2014GC23-TX against SCLP and WPLP shall be paid a paid a Pro Rata share of the SCLP Net Sale Proceeds and the WPLP Net Sale Proceeds on the later of fourteen (14) business days after the Effective Date or ten (10) Business Days after a Final Order allowing the Allowed Secured Claim.

(ii)  Allowed Class 2B Secured Claim of RSS WFRBS2014C24-TX against CHLP shall be paid from the CHLP Net Sale Proceeds on the later of fourteen (14) business days after the Effective Date or ten (10) Business Days after a Final Order allowing the Allowed Secured Claim.

Impairment.  The Class 2A and 2B Claims are impaired.

Class 3.  Allowed General Unsecured Claims.

Classification.   Class 3A consists of the Allowed General Unsecured Claims against SCLP.

Classification. Class 3B consists of the Allowed General Unsecured Claims against WPLP.

Classification. Class 3C consists of the Allowed General Unsecured Claims against CHLP.

Treatment.

(i)  The Holders of Allowed Class 3A Claims shall receive a Pro Rata share of: (a) remaining SCLP Net Sale Proceeds, after payment in full of Allowed Class 1A and 2A Claims, up to the full amount of the Allowed Class 3A Claim, without interest and (b) SCLP Net Litigation Proceeds, up to the full amount of the Allowed Class 3A Claim, without interest, to be distributed periodically by the Disbursing Agent.

(ii)  The Holders of Allowed Class 3B Claims shall receive a Pro Rata share of (a) remaining WPLP Net Sale Proceeds, after payment in full of

25

Allowed Class 1B and 2B Claims, up to the full amount of the Allowed Class 3B Claim, without interest and (b) WPLP Net Litigation Proceeds, up to the full amount of the Allowed Class 3B Claim, without interest, to be distributed periodically by the Disbursing Agent.

(iii)   The Holders of Allowed Class 3C Claims shall receive a Pro Rata share of (a) remaining CHLP Net Sale Proceeds, after payment in full of Allowed Class 1C and 2C Claims, up to the full amount of the Allowed Class 3C Claim, without interest and (b) CHLP Net Litigation Proceeds, up to the full amount of the Allowed Class 3C Claim, without interest, to be distributed periodically by the Disbursing Agent.

Impairment.  The Class 3A, 3B and 3C Claims are impaired.

Class 4.  Allowed Claims of Insiders & Affiliates

Classification.   Class 4A consists of the Allowed Claims of Affiliates against SCLP.

Classification. Class 4B consists of the Allowed Claims of Affiliates against WPLP.

Classification. Class 4C consists of the Allowed Claims of Affiliates against CHLP.

Treatment.

(i)   The Holders of Allowed Class 4A Claims shall be permitted to offset any amount due SCLP Debtor.  The remaining balance, if any, shall be paid, as follows: Class 4A Claims shall receive a Pro Rata share of (i) SCLP Net Sale Proceeds, after payment in full of Allowed Class 1A, Class 2A and Class 3A Claims and (ii) SCLP Net Litigation Proceeds after payment in full of Allowed Class 3A Claims.

(ii)   The Holders of Allowed Class 4B Claims shall be permitted to offset any amount due WPLP Debtor.  The remaining balance, if any, shall be paid, as follows: Class 4B Claims shall receive a Pro Rata share of (i) WPLP Net Sale Proceeds, after payment in full of Allowed Class 1B, Class 2B and Class 3C Claims and (ii) WPLP Net Litigation Proceeds after payment in full of Allowed Class 3B Claims.

(iii)   The Holders of Allowed Class 4C Claims shall be permitted to offset any amount due CHLP Debtor.  The remaining balance, if any, shall be paid, as follows: Class 4C Claims shall receive a Pro Rata share of (i) CHLP Net Sale Proceeds, after payment in full of Allowed Class 1C, Class 2C and Class 3C Claims and (ii) CHLP Net Litigation Proceeds after payment in full of Allowed Class 3C Claims.

Impairment. The Class 4A, 4B and 4C Claims are impaired.

Class 5.  Allowed Interests of Equity Holders.

Classification. Class 5A consists of the Allowed Equity Interests in SCLP.

Classification. Class 5B consists of the Allowed Equity Interests in WPLP.

Classification. Class 5C consists of the Allowed Equity Interests in CHLP.

Treatment.

(i)  The Holder of Class 5A Allowed Equity Interests in Debtor SCLP shall receive no distribution or any property under the Plan on account of said Interests until Allowed Class 1A, Class 2A, Class 3A, and Class 4A Claims are paid as provided under the terms of this Plan.

(ii)  The Holder of Class 5B Allowed Equity Interests in Debtor WPLP shall receive no distribution or any property under the Plan on account of said Interests until Allowed Class 1B, Class 2B, Class 3A and Class 4B Claims are paid as provided under the terms of this Plan.

(iii)  The Holder of Class 5C Allowed Equity Interests in Debtor CHLP shall receive no distribution or any property under the Plan on account of said Interests until Allowed Class 1C, Class 2C, Class 3B and Class 4C Claims are paid as provided under the terms of this Plan.

Impairment. The Class 5A, 5B, and 5C Interests are impaired.

**D.  Means of Execution of Plan**

1.  Sale of the Real Properties.  The Plan provides for the sale of the Real Properties in connection with the Sale Motion which will allow Qualified Bidders to submit Qualified Bids in connection with Bankruptcy Court approved bid procedures and may provide for a Stalking Horse Bidder and Stalking Horse Bid.  The Successful Bid shall be submitted to the Bankruptcy Court for approval and entry of the Sale Order.  The Sale Order must be entered prior to the Effective Date.  The proceeds of the sale shall be distributed pursuant to the terms of the Plan.

2.  DIP Facility.  To the extent Debtors lack sufficient funds from reserve account to fund repairs to the properties, the Debtors may seek Bankruptcy Court approval of the DIP Facility in accordance with the terms of the DIP Term Sheet which provides the Debtors with up to a $2 million facility to be utilized for repairs to the Real Properties prior to the sale, subject to the Carve Out.  If approved, Juniper shall be granted super priority senior secured liens on the Real Properties in connection with the credit granted under the DIP Facility.  Within fourteen (14) days of the Effective Date and prior to any distributions to any Allowed Class 1, Class 2, Class 3, Class 4 Claims or Allowed Class 5 Interests, the DIP Facility

shall be repaid from the Net Sale Proceeds, unless Juniper is the Successful Bidder and elects to credit bid this claim.  If Juniper is the Successful Bidder, any portion of the DIP Facility which is credit bid will not be required to be repaid.

3.    <u>Release of Liens</u>.  At the Closing Date of the sale of the Real Properties, all holders of Liens on any of the Real Properties shall release their respective Liens upon the respective Real Properties as provided in this Plan, and such holders shall execute any instruments reasonably requested to confirm and/or effectuate such release.  Liens shall attach to the Net Sale Proceeds  in the same priority as they previously attached to the respective Real Properties.

4.    <u>Sale Free and Clear</u>.  Upon Closing, all right, title and interest of the Debtors and their respective Estates in and to the Real Properties shall vest in the purchaser free and clear of all Claims, Liens, encumbrances, interests, restrictions, easements, leases, tenancies, agreements of sale and other title objections.

5.    <u>Distribution of Net Sale Proceeds</u>.  Net Sale Proceeds shall be distributed in accordance with the terms of Articles 3, 4 and 6 of the Plan.

6.    <u>Distribution of Net Litigation Proceeds.</u>  Net Litigation Proceeds for each Debtor shall be distributed periodically by the Disbursing Agent, in intervals and amount to be determined in its sole discretion.

7.    <u>Funding of Plan</u>.  The source of funds to achieve consummation of and carry out the Plan shall be (i) proceeds of the sale of the Real Properties; (ii) Other Assets and (ii) any Net Litigation proceeds, which are to be utilized to satisfy Claims in the manner and order of priority in Articles 3, 4 and 6 in the Plan.

8.    <u>Disbursing Agent.</u>  The Debtors shall each act as the Disbursing Agent for their respective assets and claims.

**E.    <u>Other Provisions of the Plan</u>**

1.    <u>Avoidance Actions</u>. The Debtors retain the right, but not the requirement, to pursue all Avoidance Actions except those specifically released in this Plan.

2.    <u>Assumption and Rejection of Executory Contracts</u>. All residential lease agreements related to the Real Properties shall be assigned to the Purchaser on the Closing Date.  The Debtors shall reject all executory contracts and leases and all other such agreements, which have not been otherwise assumed in the Plan or by prior Court order.

Any Claims arising from rejection of an executory contract or lease must be filed on or before 20 days from the Effective Date.  Otherwise, such Claims are forever barred and will not be entitled to share in any distribution under the Plan.  Any Claims arising from rejection, if timely filed and allowed, will be paid as Class 3 Claims.

28

3. <u>Conditions to Confirmation.</u> Confirmation of the Plan shall not occur, and the Bankruptcy Court shall not enter the Confirmation Order unless all of the requirements of the Bankruptcy Code for confirmation of the Plan with respect to the Debtors shall have been satisfied.  In addition, confirmation shall not occur, the Plan shall be null and void and of no force and effect, and the Plan shall be deemed withdrawn unless the Court shall have entered all orders (which may be orders included within the Confirmation Order) required to implement the Plan.

4. <u>Waiver and Nonfulfillment of Conditions to Confirmation</u>.  Nonfulfillment of any condition to confirmation of the Plan may be waived only by the Debtors.  In the event that the Debtors determine that the conditions to the Plan's confirmation which it may waive cannot be satisfied and should not, in its discretion, be waived, the Debtors, may propose a new plan, may modify this Plan as permitted by law, or may request other appropriate relief.

5. <u>Confirmation Order Provisions for Pre-Effective Date Actions</u>.  The Confirmation Order shall empower and authorize the Debtors to take or cause to be taken, prior to the Effective Date, all actions which are necessary to enable it to implement the provisions of the Plan and satisfy all other conditions precedent to the effectiveness of the Plan.

6. <u>Conditions to the Effective Date</u>.  The following are conditions precedent to the effectiveness of the Plan:  (i) the Plan is confirmed and the Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order; (ii) Debtors do not withdraw the Plan at any time prior to the Effective Date; (iii) the Closing Date shall have occurred; and (iv) the Debtors shall have sufficient Cash on hand from the Cash and the Net Sale Proceeds, to make the initial payments and distributions required under the Plan.

7. <u>Waiver and Nonfulfillment of Conditions to Effective Date</u>.  Nonfulfillment of any condition set forth in the immediately foregoing paragraph of the Plan may be waived only by the Debtors.  In the event that the Debtors determine that the conditions to the Plan's Effective Date set forth in the immediately foregoing paragraph of this Plan cannot be satisfied and should not, in their sole discretion, be waived, the Debtors may propose a new plan, may modify this Plan as permitted by law, or may request other appropriate relief.

8. <u>Binding Effect.</u>  As provided for in Section 1141(d) of the Bankruptcy Code, the provisions of the Plan shall bind the Debtors, any entity acquiring property under the Plan and any Creditor, Equity Holder, or shareholder of the Debtors, whether or not the Claim or Interest of such Creditor or Equity Holder is impaired under the Plan and whether or not such Creditor or Equity Holder has accepted the Plan.  After confirmation, the property dealt with by the Plan shall be free and clear of all Claims and Interests of Creditors and Equity Holders, except to the extent as provided for in the Plan as the case may be.  The Confirmation Order shall contain an appropriate provision to effectuate the terms of paragraph 13.1 of the Plan.

9.     <u>Satisfaction of Claims and Interests</u>.  Holders of Claims and Interests shall receive the distributions provided for in this Plan, if any, in full settlement and satisfaction of all such Claims, and any interest accrued thereon, and all such Interests.

10.     <u>Vesting of Property</u>.  Except as otherwise expressly provided in the Plan or the Confirmation Order, pursuant to Section 1141(b) of the Bankruptcy Code, upon the Effective Date, all property of the Bankruptcy Estate shall vest in the Debtors free and clear of all Claims, liens, encumbrances, charges or other Interests of Creditors and Interest Holders.

11.     <u>Preservation of Setoff Rights</u>.  In the event that the any of the Debtors have a Claim of any nature whatsoever against the Holders of Claims, the Debtor(s) may, but are not required to setoff against the Claim (and any payments or other distributions to be made in respect of such Claim hereunder), subject to the provisions of Section 553 of the Bankruptcy Code.  Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor(s) of any Claim that the Debtor(s) have against the Holder of Claims.  Neither this provision nor the injunctive provision of the Confirmation Order shall impair the existence of any right of setoff or recoupment that may be held by a Creditor herein; provided that the exercise of such right shall not be permitted unless the Creditor provides the Debtor(s) with written notice of the intent to affect such setoff or recoupment.  If the Debtor(s) or the Disbursing Agent, as applicable, object in writing within twenty (20) business days following the receipt of such notice, such exercise shall only be allowed upon order of the Bankruptcy Court.   In the absence of timely objection, the Creditor may implement the proposed setoff or recoupment against the Claim held by the respective Bankruptcy Estate.

12.     <u>Releases</u>.  On the Effective Date and pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code, the Debtors, and to the maximum extent provided by law, their respective agents, release and forever discharge all claims, including acts taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into or any other act taken or entitled to be taken in connection with the Plan or this case against the following, whether known or unknown:

    a.     Crosswinds Houston Limited Partnership, S. Chase Limited Partnership, and W. Point Limited Partnership and their current partners, managers and officers, Fabrizio Lucchese, Gordon Steele and Michael Johns ("Insider Released Parties"), in connection with any and all claims and causes of action arising on or before the Confirmation Date that may be asserted by or on behalf of each Debtor or its Bankruptcy Estate.

b.     The release of these Insider Released Parties shall be conditioned upon the occurrence of the Effective Date.

c.     The Debtors' Professionals will be released from any and all claims and liabilities from the Debtors other than gross negligence and willful misconduct or except as otherwise provided under the Professional Code of Responsibility.

13.     <u>Lawsuits</u>.  On the Effective Date, all lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of Claims against the Debtors except proof of Claim and/or objections thereto pending in the Bankruptcy Court shall be dismissed as to the Debtors.  Such dismissal shall be with prejudice to the assertion of such Claim in any manner other than as prescribed by the Plan.  **All parties to any such action shall be enjoined by the Bankruptcy Court by the Confirmation Order from taking any action to impede the immediate and unconditional dismissal of such actions.**  All lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of a claim(s) by the Debtor(s) or any entity proceeding in the name of or for the benefit of the Debtor(s) against a person shall remain in place only with respect to the claim(s) asserted by the Debtor(s) or such other entity and shall become property of the Post-Confirmation Debtors to prosecute, settle or dismiss as they see fit.

14.     <u>Insurance</u>.  Confirmation and consummation of the Plan shall have no effect on insurance policies of the Debtors in which the Debtors or any of the Debtors' representatives or agents is or was the insured party; the Debtors shall become the insured party under any such policies without the need of further documentation other than the Plan and entry of the Confirmation Order.  Each insurance company is prohibited from denying, refusing, altering or delaying coverage on any basis regarding or related to the Debtors' bankruptcy, the Plan or any provision within the Plan.

15.     <u>U.S. Trustee Fees</u>.  The Disbursing Agent shall timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree closing this Chapter 11 case, or enters an order either converting this case to a case under Chapter 7 or dismisses the case. After confirmation, the Disbursing Agent shall file with the Bankruptcy Court and shall transmit to the United States Trustee a true and correct statement of all disbursements made by each Debtor for each month or portion thereof, that this Chapter 11 case remains open in a format prescribed by the United States Trustee.

16.     <u>Abandoned Property</u>.  Any and all property whose abandonment is or has been approved by the Court pursuant to the Bankruptcy Code shall remain abandoned forever; shall not thereafter be deemed to be property of the respective Debtor or of any successor to the respective Debtor; shall not at any time re-vest in any Debtor, and shall not otherwise, whether by conveyance or otherwise, ever become the property of any Debtor.

17.  <u>Allowance of Claims under the Plan</u>.  Allowance is a procedure whereby the Bankruptcy Court determines the amount and enforceability of Claims against the respective Debtor, if the parties cannot agree upon such allowance.  It is expected that the Debtors and/or the Disbursing Agent will file objections to Claims of Creditors, if any are deemed necessary, before and after confirmation of the Plan.  The Plan merely provides for payment of Allowed Claims, but does not attempt to pre-approve the allowance of any Claims.

18.  <u>Objection Deadline</u>.  As soon as practicable, but in no event later than ninety (90) days after the Effective Date, unless extended by order of the Bankruptcy Court for cause, objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made.

19.  <u>Prosecution of Objections</u>.  On and after the Effective Date, except as the Bankruptcy Court may otherwise order, the filing, litigation, settlement or withdrawal of all objections to Claim may be made by the Debtors and/or Disbursing Agent.

20.  <u>Delivery of Distributions</u>.  Subject to Bankruptcy Rule 9010 and the provisions of the Plan, distributions to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the proofs of Claim filed by such Holders (or at the last known addresses of such a Holder if no proof of Claim or proof of Equity Interest is filed or if the Disbursing Agent has been notified in writing of a change of address), except as provided below.  If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest.  Amounts in respect of undeliverable distributions shall be returned to the Disbursing Agent until such distributions are claimed.

21.  <u>Manner of Payment under the Plan</u>. All payments made by the Disbursing Agent shall be by check and regular mail. However, at the option of the Disbursing Agent, payment may be made by wire transfer or otherwise provided that the recipient pays all costs that exceed payment by check and regular mail.

22.  <u>Time Bar for Cash Payments</u>.  Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check shall be made on or before the later of (a) the first anniversary of the Effective Date or (b) ninety (90) days after the date of reissuance of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred.

23.  <u>Unclaimed Property</u>.  Any distribution unclaimed within ninety (90) days after the last distribution to Holders of Allowed Claims in Class 3 shall be deemed

"unclaimed property" under §347 of the Bankruptcy Code. Unclaimed property shall be returned to the Disbursing Agent and shall be distributed pro rata to Holders of Allowed Claims in Class 3, excluding any payment to Creditors whose distributions were unclaimed.  If Allowed Class 3 Claims are paid in full, Unclaimed property shall be distributed pro rata to Holders of Allowed Claims in Class 4. Any distribution contemplated by Article 6.17 of the Plan shall be subject to the distribution minimum distribution requirements in Article 6.19 of the Plan.

24.   <u>Fractional Dollars</u>.  Any other provision of the Plan notwithstanding, no payments of fractional dollars will be made to any Holder of an Allowed Claim.  Whenever any payment of a fraction of a dollar to any holder of an Allowed Claim would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest whole dollar (up or down).

25.   <u>Minimum Payment</u>.  Any other provision of the Plan notwithstanding, no payments of less than fifty dollars ($50.00) will be made to the Holder of any Allowed Claim and no payments of fractional dollars will be made to any Holder of an Allowed Claim.  Whenever any payment of a fraction of a dollar to any holder of an Allowed Claim would otherwise be called for, the actual payment made may, in the sole discretion of the Disbursing Agent, reflect a rounding of such fraction to the nearest whole dollar (up or down).  If a payment is due in an amount less than $50, then such payments are hereby waived, and the funds shall be retained by the Disbursing Agent.

26.   <u>Distribution Dates</u>.  Whenever any distribution to be made under the Plan is due on a day other than a Business Day, such distribution will instead be made, without penalty or interest, on the next Business Day.  The Bankruptcy Court shall retain power, after the Confirmation Date, to extend distribution dates for cause, upon motion and after notice and a hearing (as defined in Bankruptcy Code Section 102) to affected parties.

27.   <u>Continued Operations</u>.  The Debtors will continue to operate after the Effective Date, solely in order to distribute the funds necessary to make payments to Creditors holding administrative Claims, pursue Reserved Litigation Claims and to engage in the Claims resolution process pursuant to Article 7 of the Plan.

28.   <u>Term of Stays</u>.  Except as otherwise provided in the Plan, the stay provided for in this case pursuant to Bankruptcy Code Section 362 shall remain in full force and effect until the Effective Date.

## VI.   <u>LIQUIDATION ANALYSIS</u>

Section 1129 of the Bankruptcy Code provides that the Court may confirm a plan of reorganization only if certain requirements are met.  One of these requirements is that each non-accepting holder of an allowed Claim or interest must receive or retain under the Plan, on account of such Claim or interest, property as of the Effective Date of the Plan at least equal to

the value of such holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

For the purposes of the following discussion, it is assumed that a Chapter 7 trustee would seek to maximize the value of the estate by attempting to sell the Property. However, the Debtors believe that the circumstances surrounding liquidation under Chapter 7 would inevitably lead to selling conditions which would substantially detract from the total value returned to the estate. The following are some, but not all, of the deleterious consequences that the Debtors believe would result from Chapter 7 liquidation:

- Substantial Chapter 7 administrative costs relating to professional fees, management fees, broker commissions, sales commissions and other associated expenses would necessarily be incurred.

- The sale of the Debtors' assets and business under the time pressure and adverse publicity attendant to Chapter 7 liquidation would create a difficult selling environment and would result in a transaction consummated at a substantial discount to going-concern value.

- If the case is converted to a case under Chapter 7 of the Bankruptcy Code, Secured Lenders will likely foreclose on all of the assets, leaving a "no asset case." Under this scenario, only Secured Lenders, the holders of M&M Lien Claims and ad valorem taxing authorities will receive a distribution and all other classes of claimants (including administrative claimants) recover nothing. The Debtors believe that this would be the likely result if the case is converted to Chapter 7.

- Furthermore, the Debtors expect that the process of winding down the Debtors' affairs, objecting to claims and making dividends would likely take nine to twelve months in a Chapter 7. Substantial distributions under the plan are expected soon after the Effective Date. The Debtors submit that the holders of Allowed General Unsecured Claims will receive at least as much consideration under the Plan as they would receive in a Chapter 7 liquidation scenario.

The Debtors do not believe that these cases should be converted to Chapter 7. Attached as Exhibit H is a liquidation analysis (the "Liquidation Analysis") which reflects possible distributions under the Plan to creditors holding Allowed Claims as well as those projected in a Chapter 7 liquidation. This Liquidation Analysis indicates that the Real Properties would lose significant value in a Chapter 7 and Holders of Allowed General Unsecured Claims the Debtors cases would receive a much lower distribution, if any, in a Chapter 7 liquidation, which is a far less desirable result than the result to be achieved under the Plan.

## VII.    RISKS POSED TO CREDITORS

The principal risk to the creditors is that the Plan will not be confirmed. Absent confirmation of the Plan, Secured Lenders will likely obtain stay relief and unsecured creditors would not receive any distribution on account of their Claims.

# VIII.   ALTERNATIVES

Although the Disclosure Statement is intended to provide information to assist creditors in making a judgment on whether to vote for or against the Plan, and although creditors are not being offered through that vote an opportunity to express an opinion concerning alternatives to the Plan, a brief discussion of alternatives to the Plan may be useful.  These alternatives include conversion to a Chapter 7 or dismissal of the proceedings.  The Debtors, of course, believe the proposed Plan to be in the best interests of creditors.   The Debtors assess the alternatives as follows:

## A.   Conversion to Chapter 7

The first alternative would be to convert the Chapter 11 case to a Chapter 7 liquidating bankruptcy. If this occurred, the Bankruptcy Court will appoint a trustee to liquidate each Debtor's assets for the benefit of its creditors.  The costs associated with a trustee would then be added to the additional tier of administrative expenses entitled to priority over general unsecured claims upon conversion.  Such administrative expenses include the Chapter 7 Trustee's commissions, as well as fees for professionals retained by the Chapter 7 Trustee to assist in the liquidation. The Trustee's commissions are based on disbursements to creditors.  The Trustee receives 25% of the first $5,000, 10% of the next $45,000, 5% of the next $950,000 and 3% on all amount disbursed in excess of $1 million.

In a Chapter 7 case, each Debtor would likely cease operating, the secured lender would lift the stay and foreclose on each Debtor's assets, and unsecured creditors would receive no distribution on account of their claims.

## B.   Dismissal

Dismissal of the proceeding would likely result in each Debtor defending debt-collection litigation and numerous new lawsuits to collect debts.  The Secured Lenders would foreclose on substantially all of the Debtors' assets, halting the Debtors' operations.  Even if there were unencumbered assets, the creditors who receive quick judgments will be able to execute and recover their claims leaving nothing for the remaining creditors.

## C.   No Assurance of Either

There are other possibilities which are less likely, such as a competing plan proposed by a different party.  The Debtors have attempted to set forth the reasonable alternatives to the proposed Plan. However, the Debtors must caution creditors that a vote must be for or against the Plan.  The vote on the Plan does not include a vote on alternatives to the Plan.  There is no assurance what course the proceedings will take if the Plan fails acceptance.

# IX.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES

## A.   Tax Consequences to Creditors

1. GENERALLY

The tax consequence to any particular creditor may vary depending on their own circumstances and they should consult with their own tax professional for advice regarding the impact on them of their acceptance or rejection of the plan.

2. UNSECURED CLAIMS

Holders of Class 3 Unsecured Claims will receive distributions from the Disbursing Agent.  A Class 3 Claimholder should either be treated as (i) recognizing ordinary income in an amount equal to cash received and recognizing a loss in an amount equal to the tax basis in the Claim or (ii) recognizing a loss equal to the difference between the amount of cash received and their tax basis in their Claim.

A Claimholder's tax basis in a Claim should generally equal the amount included in income as a result of the provision of goods or services to the Debtors, except to the extent that a bad debt loss had previously been claimed. The gain or loss with respect to the Claim should be ordinary to the extent that it arose in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtors.

**DUE TO THE COMPLEX NATURE OF APPLICABLE TAX LAWS, CLAIMANTS SHOULD CONSULT WITH THEIR TAX PROFESSIONAL CONCERNING COMPLIANCE WITH AND THE AFFECT OF BOTH STATE AND FEDERAL TAX LAWS ON THEIR INTEREST BEFORE THEY CAST A BALLOT TO ACCEPT OR REJECT THE PLAN.**
**THE ACCOUNTANTS, ATTORNEYS, AND THE MANAGEMENT OF THE DEBTOR MAKE NO REPRESENTATIONS HEREIN CONCERNING THE IMPACT OF THE TAX LAW ON ANY INDIVIDUAL TREATED UNDER THE PLAN.**

B.      **Tax Consequences to the Debtors**

The Debtors have elected to be treated as a pass-through entity for income tax purposes and, as such, are not subject to income taxes.  Rather, all items of taxable income, deductions and tax credits are passed through to and are reported by its owners on their respective income tax returns.  Each Debtor's federal tax status as a pass through entity is based upon its legal status as a partnership.  Accordingly, each Debtor is not required to take any tax positions in order to qualify as a pass-through entity.  Each Debtor is required to file and does file tax returns with the Internal Revenue Service and other taxing authorities.

X.      **PREFERENCES AND FRAUDULENT TRANSFERS**

Under the Bankruptcy Code and Texas State Law, the bankruptcy estate may sue to recover assets (or their value) that were transferred by "voidable transfers", which includes assets transferred:

29.      in fraud of Creditors,

30.      in constructive fraud of Creditors – because the asset was transferred without sufficient consideration while the Debtor was insolvent,

31.        as a preferential transfer - a payment before bankruptcy outside the ordinary course that allows a creditor to receive more than it would receive in liquidation, or

32.        as an unauthorized post-bankruptcy transfer by the Debtor outside of the ordinary course.

The Debtors believe there are certain transfers that may be voidable under Section 550, 547, 548, 544, or similar provision of the Bankruptcy Code and/or non-bankruptcy law. Specifically, prior to bankruptcy, the Debtors made certain payments to insiders which have not been released.  The Debtors reserve the right to bring fraudulent conveyance claims to the extent not previously released by Bankruptcy Court order or specifically released as part of the Plan.  A more detailed discussion of potential Chapter 5 actions and other litigation, including Reserved Litigation Claims which may be pursued is below in Section XI. Litigation.

The Debtors have not conducted a detailed analysis of potential recoveries under Chapter 5 of the Bankruptcy Code but believe that potential claims may exist. A list of the known payments is set forth in each of the Debtors' statements of financial affairs, which are incorporated herein.  Creditors, Interest Holders and parties-in-interest are advised that if they received an avoidable transfer, they may be sued whether or not they vote to accept the Plan. Except as specifically provided in the Plan or previously released in by Bankruptcy Court order, all avoidance actions and rights pursuant to §§ 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 and 724 of the Bankruptcy Code and all causes of action under state, federal or other applicable law shall be retained and may be prosecuted or settled by each of the Debtors, in its sole discretion. To the extent that material amounts are recovered, it will enhance the returns to the holders of Unsecured Claims.

If the Plan is not confirmed and a Chapter 7 trustee is appointed, it is possible that the trustee's analysis will differ from that of the Debtors and that other avoidance actions will be commenced against other Creditors of the estate or insiders.

## XI.    **LITIGATION - PENDING AND POTENTIAL LITIGATION**

### A.    **Prepetition Litigation**

As of the petition date, there were several lawsuits pending in which one or more of the Debtors was named as a defendant.  Of those lawsuits, most were initiated by non-debtors and named one or more Debtors as a defendant.  Generally speaking, these were collection lawsuits and are thus automatically stayed by operation of 11 U.S.C. § 362(a).   Each such lawsuit is disclosed in response to question number 7 on the respective statements of financial affairs filed by each Debtor.  A list reflecting such lawsuits is attached hereto and marked Exhibit I.  No claim of environmental liability has been made, and no such claims are known or expected.

### B.    **Reserved Litigation Claims**

A non-exhaustive list of Reserved Litigation Claims is attached hereto as Exhibit J and as Exhibit 1 to the Plan.  A summary of the claims is below.

1.     *Potential Chapter 5 Litigation That the Debtors May Pursue*

*Chapter 5 Claims, Generally*.   The Debtors have conducted an initial analysis of potential recoveries under chapter 5 of the Bankruptcy Code and concluded that claims may exist. A list of the known payments is set forth in the Debtors' respective statements of financial affairs, which are incorporated herein.   In addition, the transfers reflected in the Debtors' respective statement of financial affairs are attached hereto and marked Exhibits J.   **Creditors, Interest Holders and parties-in-interest are advised that if they received** an **avoidable transfer, they may be sued whether or not they vote to accept the Plan**. All avoidance actions and rights pursuant to §§ 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 and 724 of the Bankruptcy Code and all causes of action under state, federal or other applicable law, including the Texas Uniform Fraudulent Transfer Act, shall be retained and may be prosecuted or settled by the Debtors. To the extent that material amounts are recovered, it will enhance the returns to the holders of Unsecured Claims.  For the removal of doubt, even if transfers are not listed on any attachment to the disclosure statement, the Debtors reserve all rights to sue for avoidance and recovery of any pre-bankruptcy transfer or obligation, without regard to when the transfer occurred, or to whom the transfer was made or obligation is owed.

*Preferences*.     Under the Bankruptcy Code, the Debtors may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of the bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the Debtor been liquidated under chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one-year preference period. There are certain defenses to such recoveries. Transfers made in the ordinary course of the Debtors' and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable. Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property. If a transfer is recovered by the Debtors, the transferee has a General Unsecured Claim to the extent of the recovery. The Debtors reserve the right to bring preferential transfer claims against any creditor or vendor whatsoever, as well as the parties identified as receiving transfers within 90 days of the Petition Date on pages on the attached Exhibit J.

*Fraudulent Transfers*.   Under the Bankruptcy Code and various state laws, including the Texas Uniform Fraudulent Transfer Act, the Debtors may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered the Debtor insolvent.    Under the same statutes, the Debtors may avoid certain pre-bankruptcy obligations. The Debtors reserve the right to bring fraudulent transfer and avoidance claims. In addition to the transfers identified in the statements of affairs excerpts attached hereto, other transfers potentially subject to Chapter 5 avoidance and recovery, are those also listed on Exhibit J, attached hereto.

*Post-petition Transfers*.   Post-petition transfers neither authorized by Bankruptcy Court order nor authorized by the Bankruptcy Code are avoidable and recoverable. 11 U.S.C. § 549. The Debtors reserve the right to bring suit for recovery of any such transfer, including, without limitation, for recovery of any post-petition setoff.

*Other Potential Litigation.*  All causes of action under state, federal or other applicable law shall be retained and may be prosecuted or settled by the Debtors, including, but not limited to, claims listed in each Debtor's bankruptcy schedules, claims described herein, including but not limited to claims against Secured Lenders, BCDR Investors, LP and Presto Drapery Services, Inc. d/b/a/ Presto Maintenance Supply, Inc. and Delaney's Restoration, Inc. aka Delaney's Roofing.  For the removal of doubt, and without limiting the immediately preceding more general and encompassing reservations of all rights,  unless you are a party released by operation of the Plan or prior Bankruptcy Court order, the Debtors' reserve all rights to file any lawsuit or administrative proceeding (or any other legal action whatsoever) against you, or any other person or entity, (i) without regard to status, if any, as a Holder of a Claim, or Holder of an Interest, and (ii) without regard to a vote in favor of the Plan by a Holder of a Claim or a Holder of an Interest.

## XII.    MANAGEMENT OF THE DEBTORS

### A.    Officers of the Debtor

Gord steele is the chief financial officer of the general partner of each debtor.  Mr. Steele will oversee the winding down of each debtor upon the effective date of the plan and subsequent distributions to creditors with allowed claims.  Mr. Steele currently receives no compensation from any of the debtors.

## XIII.    ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.    Acceptance of the Plan

Confirmation of a Plan under Chapter 11 requires, among other things, that at least one class of creditors or claimants, such as the secured or unsecured creditors in this case, vote in favor of the Plan.  This vote is calculated by only counting those creditors who actually send in a ballot on time.  If two thirds in total dollar amount and a majority in number of claims actually voting in a class approve the Plan, that class of creditors is considered an accepting class.  If the vote is insufficient, the Court can still confirm the Plan, but only upon being provided additional proof regarding the ultimate fairness of the Plan to the creditors.  The Debtors believe that the unsecured creditors will support the Plan when they consider the fact that the secured and priority creditors will receive all of the assets of the Debtors in the event the Plan is unsuccessful.

The proponent of a Plan also must meet all other applicable requirements of Section 1129(a) of the Bankruptcy code (except Section 1129(a)(8), if the proponent proposes to seek confirmation of a Plan under Section 1129(b) of the Bankruptcy Code).   These other requirements include, among other things, that the Plan comply with the applicable provisions of Title 11 and other applicable law, that the Plan be proposed in good faith, and that at least one impaired class of creditors vote to accept the Plan.  The Debtors believe that the Plan satisfies all other applicable requirements of Section 1129(a) of the Bankruptcy Code.

**B.**   **Confirmation without Acceptance of All Impaired Classes**

The Bankruptcy Court may confirm a plan even if not all impaired classes accept the Plan.  For the Plan to be confirmed over the rejection of an impaired class, the proponent must show, among other things, that the plan does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class that has not accepted the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides:  (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain, on account of its claim, property that has a value as of the Effective Date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interest of such class will not receive or retain, on account of such junior claim or interest, any property unless the senior class is paid in full.  The Bankruptcy Court must further find that the economic terms of a plan do not unfairly discriminate as provided in Section 1129(b) of the Bankruptcy Code with respect to the particular objecting class.
**THE DEBTORS BELIEVE THAT THE PLAN HAS BEEN STRUCTURED SO THAT IT WILL SATISFY THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AND CAN BE CONFIRMED OVER THE REJECTION OF THE PLAN BY SECURED CREDITORS, IF A CRAMDOWN IS REQUESTED. THE DEBTORS BELIEVE THAT THE UNSECURED CREDITORS WILL SUPPORT THE PLAN SINCE THE ALTERNATIVE, LIQUIDATION, WILL LIKELY PAY THE SECURED CREDITORS ALL THE ESTATES' ASSETS, LEAVING NO RETURN TO UNSECURED CREDITORS.**

**C.**   **Other Requirements for Confirmation**

In order to obtain confirmation of the Plan, the requirements of Section 1129 of the Code must be satisfied.  These requirements include but are not limited to findings that the Plan complies with the applicable provisions of Chapter 11 of the Code, that the Debtors have complied with the applicable provisions of Chapter 11 of the Code, that the Plan has been proposed in good faith and not by any means forbidden by law, and at least one class of impaired claims has voted to accept the Plan.  The Debtors believe that the Plan satisfies all the statutory requirement of Chapter 11 of the Bankruptcy Code.

1.   BEST INTEREST OF CREDITORS

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each class, that each holder of a claim or interest of such class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date, that is not less than the amount that such person would receive or retain if the Debtors were, on the effective date, liquidated under Chapter 7 of the Bankruptcy Code.  As set forth above, the Debtors believe that this test will be satisfied.

2.    FINANCIAL FEASIBILITY

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the bankruptcy court, the bankruptcy court must determine that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  The Debtors believe that it will be able to fulfill its obligations under the Plan as the Plan payments (plus US Trustee fees) will be derived from the proceeds of the proposed sale of the Real Properties, along with any cash retained by each Debtor.

**D.    Cram-Down - Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Code contains provisions for confirmation of a Plan even if the Plan is not accepted by all impaired classes, provided that at least one impaired class of claims has accepted it (determined without including any acceptance by any insider holding a claim of such class).  These "cram-down" provisions, for confirmation of a Plan despite the non-acceptance of one or more impaired classes of claims or interests, are set forth in Section 1129(b) of the Bankruptcy Code.

In the event that any impaired class of claims does not accept the Plan by the requisite majority set out in the introduction, the Debtors must demonstrate to the Bankruptcy Court, with respect to each impaired class which does not accept the Plan that the Plan does not discriminate unfairly, and is "fair and equitable" with respect to that class.  Under the Bankruptcy Code, a Plan is considered "fair and equitable" with respect to secured claims, unsecured claims or interest, as the case may be, if the following conditions are met:

(a)    Secured Claims.  The holders of such claims retain their liens, to the extent of the allowed amount of their secured claims, and that each holder of such a claim receive on account of such secured claim cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in the collateral.

(b)    Unsecured Claims.  Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value as of the effective date of the Plan equal to the amount of its allowed claim, or (ii) the holder of any claim or interest that is junior to the claims of the dissenting class will not receive or retain any property under the Plan.

The Debtors believe that the Plan meets the "fair and equitable" test and does not discriminate unfairly with respect to any class of creditors or interest holders.  Therefore, the Plan may be confirmed, even if it is rejected by the holders of allowed claims and interests.

## XIV. CONCLUSION

The information provided in this Disclosure Statement is intended to assist you in voting on the Plan in an informed fashion.  If the Plan is confirmed, you will be bound by its terms. Accordingly, you are urged to make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Respectfully submitted this <u>11</u><sup>th</sup> day of June, 2018.

S CHASE LIMITED PARTNERSHIP
By: S Chase General Partner, Inc.,
      its general partner

***Gordon Steele with permission by /s/ Melissa A. Haselden***

By:_____
            Gordon Steele, Chief Financial Officer
            of S Chase General Partner, Inc.

W POINT LIMITED PARTNERSHIP
By: WP General Partner, Inc.,
      its general partner

***Gordon Steele with permission by /s/ Melissa A. Haselden***

By:_____
            Gordon Steele, Chief Financial Officer
            of WP General Partner, Inc.

CROSSWINDS HOUSTON LIMITED PARTNERSHIP
By: Crosswinds General Partner, Inc.,
      its general partner

***Gordon Steele with permission by /s/ Melissa A. Haselden***

By:_____
            Gordon Steele, Chief Financial Officer
            of Crosswinds General Partner, Inc.

HOOVER SLOVACEK LLP
MELISSA A. HASELDEN
State Bar No. 00794778
DEIRDRE CAREY BROWN
State Bar No. 24049116
Galleria Tower II
5051 Westheimer, Suite 1200
Houston, Texas 77056
Telephone: 713.977.8686
Facsimile:  713.977.5395
Email: haselden@hooverslovacek.com
            brown@hooverslovacek.com

ATTORNEYS FOR DEBTORS

43